**Affirmed and Memorandum Opinion filed April 9, 2015.**



In The

# 𝔉𝔬𝔲𝔯𝔱𝔢𝔢𝔫𝔱𝔥 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

## NO. 14-14-00070-CR

### INIUBONG EBONG, Appellant

### V.

### THE STATE OF TEXAS, Appellee

**On Appeal from the 351st District Court
Harris County, Texas
Trial Court Cause No. 1374974**

## M E M O R A N D U M    O P I N I O N

A jury convicted appellant Iniubong Ebong of felony murder[1] and assessed his punishment at 40 years' imprisonment. Appellant contends that the trial court committed reversible error by (1) overruling his *Batson* challenge[2] and; (2) failing to instruct the jury on the lesser-included offense of injury to a child.[3] We affirm.

---

[1] *See* Tex. Penal Code Ann. § 19.02(b)(3) (Vernon 2011).

[2] *See Batson v. Kentucky*, 476 U.S. 79 (1986).

[3] *See* Tex. Penal Code Ann. § 22.04(a) (Vernon Supp. 2014).

BACKGROUND

Appellant and Laquisha Downs Ebong were the parents of five-month-old Indya Ebong. Appellant visited Laquisha, Indya, and Laquisha's five-year-old daughter on November 25, 2010, for Thanksgiving, and then stayed overnight.

Laquisha fed Indya early in the morning on November 26, 2010, and left for work. Appellant stayed at Laquisha's apartment to watch Indya and Laquisha's older daughter. Appellant and Laquisha communicated by text messages throughout the day. Around 4:15 p.m., appellant sent Laquisha several text messages stating that something might be wrong with Indya and that Indya needed to go to the hospital.

Laquisha returned home around 5:20 p.m. She saw appellant lying on her couch with Indya on his chest. Laquisha picked up Indya. Indya was not moving or breathing. Laquisha attempted to perform CPR on Indya for about 10 seconds by pressing on Indya's chest with two fingers and blowing into Indya's mouth. Indya remained unresponsive. Appellant drove Indya, Laquisha, and Laquisha's older daughter to the hospital. They arrived approximately five minutes later.

Laquisha handed Indya to nurse Michelle Lee Dissinger upon arrival. Dissinger testified that Indya felt very stiff. Dissinger rushed Indya to the emergency room and called the medical team to begin life support measures. Indya's clothes were cut off; Dissinger saw that Indya's stomach was distended and showed several circular bruises. Indya was ashen. The baby was pronounced dead at 6:00 p.m.

The State indicted appellant for felony murder. The indictment alleged that appellant committed the felony offense of injury to a child "by intentionally, knowingly, recklessly[,] and with criminal negligence causing bodily injury to

2

Indya Ebong," and "while in the course of and furtherance of the commission of and attempt to commit said offense did commit and attempt to commit an act clearly dangerous to human life." The State alleged, in four alternative pleading paragraphs, that appellant committed the offense of injury to a child and committed an act clearly dangerous to human life by (1) "striking [Indya] with his hand;" (2) "causing [Indya's] abdomen to strike a blunt object;" (3) "striking [Indya's] abdomen with an unknown object;" and (4) "causing [Indya's] abdomen to strike an unknown object."

Appellant argued at trial that the State could not prove his guilt beyond a reasonable doubt. He argued that the State's evidence only placed him with Indya on the day of her death and did not prove that his actions caused her death.

The State played a recording of a police interrogation of appellant at trial. Appellant stated to police that he accidently dropped Indya onto the floor while he was holding her on November 26, 2010. Appellant stated that, after Indya fell to the floor, she cried. Appellant stated that he "patted" Indya to get her to stop crying and that he "accident[ly] . . . . patted her too hard."

Dissinger testified that Indya's body temperature was 92.3 degrees Fahrenheit when she was brought to the hospital and that normal human body temperature is 98.6 degrees Fahrenheit. Dissinger opined that Indya had been dead for "a little while" when Laquisha first handed her Indya because Indya was stiff. Indya's stiffness indicated to Dissinger that rigor mortis had set in. Dissinger explained that rigor mortis can set in between 30 minutes to four hours after death.

Dissinger testified that the bruising pattern on Indya's stomach indicated that Indya's bruises were caused by someone's hand. Dissinger explained that the color of Indya's bruises indicated that they were recent. Dissinger opined that Indya had suffered her bruises while she was still alive.

Dissinger stated that she had seen cases of extreme damage to an individual's liver. She testified that extreme damage to an individual's liver is generally caused by a severe direct blow, by a motor vehicle accident, or by a fall from a height greater than 20 feet. She stated that extreme damage to an individual's liver could not be caused by a fall from someone's arms.

Dr. Morna Gonsoulin has been an assistant medical examiner at the Harris County Institute of Forensic Science since 2000. She performed the autopsy on Indya's body. Dr. Gonsoulin testified that, during the autopsy, she observed Indya's liver to be extensively damaged. It was torn with several tissue pieces wholly separated from the organ. Dr. Gonsoulin opined that Indya's liver damage was the result of significant blunt force trauma to the abdomen. Dr. Gonsoulin further opined that a great deal of force would have been required to cause Indya's liver damage. Dr. Gonsoulin stated that the force required to cause Indya's liver damage could have been produced by a car accident or by a very high fall from a balcony or bridge. Dr. Gonsoulin stated that the force required to cause Indya's liver damage could not have been produced by a fall from standing height.

Dr. Gonsoulin also testified that Indya's right adrenal gland was distended and filled with blood; Indya's esophagus was traumatically dissected from its connective tissue attachment; Indya's pancreas and small intestine showed hemorrhages; Indya's lungs displayed bubbles of blood and small hemorrhages; and Indya's ribs were fractured in several places. Dr. Gonsoulin opined that the cause of Indya's death was blunt force injuries of the abdomen and chest and that the manner of Indya's death was homicide. Dr. Gonsoulin further opined that Indya's injuries were not consistent with a fall from the arms of a standing adult, even if Indya had landed on an object such as a toy. Dr. Gonsoulin stated that Indya's injuries were not consistent with an improper CPR attempt performed with

4

two fingers.  Dr. Gonsoulin stated that Indya's injuries were consistent with an individual punching Indya's abdomen with a fist or hand as hard as the individual could.  Dr. Gonsoulin further opined that striking a five-month-old infant in her abdomen, or causing the infant's abdomen to strike a blunt or unknown object, is an act clearly dangerous to human life.

The jury also heard testimony from Dr. Sharon Derrick, who has been a forensic anthropologist with the Harris County Institute for Forensic Sciences since 2006.  She performed a pediatric skeletal examination of Indya's body after the autopsy.  Dr. Derrick observed 24 rib fractures on Indya's body.  Dr. Derrick testified that the characteristics of the fractures indicated that the fractures had been made near the time of Indya's death.  Dr. Derrick opined that the fractures were consistent with blunt force trauma and were not consistent with a fall from a height of five or six feet or a fall off a couch or a bed.

The jury found appellant guilty and assessed his punishment at 40 years' imprisonment.  Appellant timely appealed.

ANALYSIS

## I.    *Batson* Challenge

Appellant is African American.  Before the trial court impanelled the jury, appellant made a *Batson* challenge to the State's use of a peremptory strike on venire member number six, who was the only African-American venire member remaining on the venire after several dozen members were excused for cause or by agreement of the parties.  *See Batson v. Kentucky*, 476 U.S. 79 (1986).  The trial court denied appellant's challenge.  In his first issue, appellant contends that the trial court erred by failing to determine that the State struck venire member number six on the basis of race in violation of "the Equal Protection Clause of the Fifth

5

Amendment to the [United States] Constitution" and Texas Code of Criminal Procedure article 35.261. We analyze appellant's issue under the framework established in *Batson*.[4]

## A. Standard of Review and Applicable Law

In *Batson*, the United States Supreme Court held that the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution forbids the State from exercising its peremptory strikes based solely on the race of a potential juror. *Batson*, 476 U.S. at 89; *Nieto v. State*, 365 S.W.3d 673, 675 (Tex. Crim. App. 2012); *Jones v. State*, 431 S.W.3d 149, 154 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd); *see* U.S. Const. amend. XIV, § 1. Even a single impermissible strike for a racially motivated reason invalidates the jury-selection process and requires a new trial. *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008); *Jones*, 431 S.W.3d at 154.

A *Batson* challenge consists of three steps. *Nieto*, 365 S.W.3d at 675. First, the defendant must make a *prima facie* showing of racial discrimination in the State's use of a peremptory strike. *Id.* If the defendant does so, then the State must articulate a race-neutral explanation for its strike. *Id.* The race-neutral explanation does not have to be "persuasive, or even plausible." *Purkett v. Elem*, 514 U.S. 765, 768 (1995). Rather, "the issue is the facial validity of the [State]'s explanation. Unless a discriminatory intent is inherent in the [State]'s explanation,

---

[4] The Texas Legislature adopted the *Batson* analysis in Texas Code of Criminal Procedure article 35.261. *See* Tex. Code of Crim. Proc. Ann. art. 35.261 (Vernon 2006); *Nieto v. State*, 365 S.W.3d 673, 676 n.2 (Tex. Crim. App. 2012). The United States Supreme Court decided *Batson* on the basis of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. *See Batson*, 476 U.S. at 79; *Jones v. State*, 431 S.W.3d 149, 154 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd); *see also* U.S. Const. amend. XIV, § 1. Appellant makes a single reference to the Fifth Amendment, but he cites no authority and offers no explanation for this reference. To the extent appellant asserts a Fifth Amendment argument, we find appellant has waived the complaint by failing to brief it. *See* Tex. R. App. P. 38.1(i).

the reason offered will be deemed race neutral." *Id.* (quoting *Hernandez v. New York*, 500 U.S. 352, 360 (1991) (plurality opinion)). Third, the trial court must determine if the defendant has proved purposeful discrimination by a preponderance of the evidence. *Blackman v. State*, 414 S.W.3d 757, 764 (Tex. Crim. App. 2013); *Nieto*, 365 S.W.3d at 675.

We review a trial court's ruling on a *Batson* challenge for clear error focusing on the genuineness of the asserted non-racial motive for the strike, rather than the reasonableness. *Nieto*, 365 S.W.3d at 676. We should consider the entire voir dire record in assessing the trial court's determination, and we are not limited to arguments or considerations that the parties specifically called to the trial court's attention so long as those arguments or considerations are manifestly grounded in the appellate record. *Watkins v. State*, 245 S.W.3d 444, 448 (Tex. Crim. App. 2008). We give great deference to the trial court's ruling on the issue of discriminatory intent because a finding regarding intentional discrimination largely turns on the trial court's evaluation of the demeanor and credibility of the attorney who exercised the peremptory challenge. *Hernandez v. New York*, 500 U.S. 352, 364-65 (1991) (plurality opinion); *Alexander v. State*, 866 S.W.2d 1, 8 (Tex. Crim. App. 1993). Additionally, race-neutral reasons for peremptory challenges often invoke a juror's demeanor, making the trial court's firsthand observations of even greater importance. *Snyder*, 552 U.S. at 477. We will not disturb the trial court's ruling unless we are left with a definite and firm conviction that a mistake has been committed. *Hernandez*, 500 U.S. at 369.

## B.    Discussion

The parties do not dispute that appellant made a *prima facie* showing based on the State's use of a peremptory strike on venire member number six. The trial court questioned the State on its motive for exercising the strike in the following

7

exchange:

THE COURT:  Why did you strike —

[THE STATE'S COUNSEL 1]:  No. 6.  Sorry.  No. 6, to your voir dire, Judge, she — you were speaking about who do you expect to be witnesses on a case, and she brought up:  I expect a neighbor to be a witness.  She agreed with bias, as you were speaking to her, as far as to police officers.  When you were talking, she was shaking her head yes, but she didn't speak up later.  And she also agrees with this is a big deal and a felony and a huge thing to the defendant, so . . .

[APPELLANT'S COUNSEL 1]:  Judge, may I speak?

THE COURT:  Sure.  Okay.

[APPELLANT'S COUNSEL 1]:  If I recall, your question was:  Who could testify, not who's required to testify in that case.  And she did say neighbor or other relatives who may have been present at the scene.

THE COURT:  I said the second part, but she did say the first part.

[THE STATE'S COUNSEL 1]:  And no other juror made the statements that she made like Juror 6 did.

THE COURT:  Is that all you've got? That doesn't sound like —

[THE STATE'S COUNSEL 2]:  Can I explain?

THE COURT:  Sure.

[THE STATE'S COUNSEL 2]:  Okay. She brought up — you were talking about what kind of evidence and she brought up neighbors. And to me, that is — in a child abuse case, she would expect there to be independent witnesses.  And in this case, all we have are he's in love with his baby.  There aren't any other — there are no neighbors, there's no friends.  There's nobody in that apartment other than the two of them.  And that was her — she came up with that.  That gives us a lot of concern that she is going to expect someone to be able to say what happened in that apartment that day.  And all we have is what he told the police later and the injuries to the baby.  That's why I

8

was concerned about the neighbors, because she came up with it like some sort of expectation.

THE COURT: I mean, the lady in the back that came up with the EMS and first responders and stuff like that —

[THE STATE'S COUNSEL 2]: I don't know which one that is.

THE COURT: I don't know which one it was, either.

[THE STATE'S COUNSEL 2]: So, I mean, a lot of these people are struck for cause at this point in time.

THE COURT: She was the social worker.

[THE STATE'S COUNSEL 1]: We struck her.

[THE STATE'S COUNSEL 2]: Well, we did strike her, because she was the one that started going off on the whole bias thing and kind of got a little whacky, but I don't remember that. I was —

[THE STATE'S COUNSEL 1]: That was —

[THE STATE'S COUNSEL 2]: She was a nurse and later she volunteered for social working.

THE COURT: Well, I know there were others struck —

[THE STATE'S COUNSEL 2]: Yes, we struck both of them, so —

[APPELLANT'S COUNSEL 2]: Your Honor, if I may —

[THE STATE'S COUNSEL 2]: And it was a race-neutral reason. That was it.

[APPELLANT'S COUNSEL 2]: If I may. The prosecutor then followed up and asked CSI questions or what else anybody else would require. Juror No. 6 got silent. I mean, she in no way said that she would require neighbors or require any other testimony. My interactions with her, your interactions with her, the prosecutor's interactions with her, she has been probably the most neutral, fair, and impartial person I've seen. She's had plenty an opportunity to

9

disqualify herself and she's been —

[THE STATE'S COUNSEL 2]: You talked to her a lot about the three-year-old and that she doesn't discipline and — you know, I just — she talked about the discipline of the three-year-old and her stepson and it's not her job, it's her husband's job. A lot of this just gave us cause for concern. And the neighbor thing was the main thing.

THE COURT: Motion denied.

Appellant argues that the State offered two explanations for its peremptory strike of venire member number six that are not supported by the record.

First, the State expressed concern that venire member number six was biased against police officers because she shook her head affirmatively when the trial court questioned her regarding bias. Appellant argues that the record shows that venire member number six explained why she shook her head and thus cleared any misconception that she was biased against police officers.

We have reviewed the voir dire record. The record does not contradict the State's explanation for exercising its peremptory strike on venire member number six because she shook her head in response to the trial court's questioning regarding bias against police officers. Appellant cites to a section of the voir dire record in which venire member number six explained why she shook her head in response to the State's question about whether she could convict appellant if he were proven guilty. This section of the voir dire record is not the same section as the trial court's questioning regarding bias against police officers. The record shows that the trial court explained bias and asked row by row whether any venire member was biased against police officers. Venire member number six did not state on the record whether she was biased, and the record does not indicate whether she shook her head. Appellant's counsel did not contest the State's

10

assertion that venire member number six shook her head affirmatively when arguing his *Batson* challenge to the trial court.

The trial court was in the best position to determine whether the State's explanation for its strike based on venire member number six's asserted affirmative head shake was genuine. *See United States v. Williams,* 264 F.3d 561, 572 (5th Cir. 2001) (*Batson* inquiry is "quintessentially a question of fact which turns heavily on demeanor and other issues not discernable from a cold record, such that deference to the trial court is highly warranted."). On this record, we defer to the trial court's determination that the State offered a genuine, race-neutral explanation for its strike based on venire member number six's asserted affirmative head shake during questioning regarding bias against police officers. *See Nieto*, 365 S.W.3d at 680 ("The State's description of [venire member's] demeanor is considered proved on the record because [a]ppellant's counsel did not rebut the observation."); *Watkins*, 245 S.W.3d at 447 ("Whether the opponent satisfies his burden of persuasion to show that the proponent's facially race-neutral explanation for his strike is pre-textual, not genuine, is a question of fact for the trial court to resolve in the first instance.").

Second, the State explained that its strike was motivated by its concern that venire member number six expected testimony from a neighbor at the guilt-innocence phase of trial. Appellant asserts: "A search of the entire voir dire examination conducted by the court and the attorneys fails to confirm any such statement by this [venire member]."

We have reviewed the record. The record does not clearly indicate that venire member number six stated that she expected a neighbor to testify. Instead, venire member responses are recorded on the record without any indication of which member gave the response.

The trial court asked the venire members who they thought might testify during the guilt-innocence phase of trial. The record shows the following response: "VENIREPERSON: I mean, I would probably think maybe a neighbor could have witnessed a crime." Twenty pages later, the record shows this statement by the trial court: "And, again, we talked about a circumstance where the only witness to whatever happened happened, if it did happen, is the defendant. Because, you know, there's not always somebody in the house, [venire member number six],[5] like you talked about, or a neighbor." Appellant's counsel stated, when he argued his *Batson* challenge after completion of voir dire: "If I recall, [the trial court's] question was: Who could testify, not who's required to testify in that case. And [venire member number six] did say neighbor or other relatives who may have been present at the scene."

The trial court record is unclear as to what, if anything, venire member number six stated regarding her expectation that a neighbor might testify at trial. At a minimum, the record shows that appellant's counsel agreed that venire member number six stated that a neighbor or other relative could testify at trial. We defer to the trial court's determination that the State offered a genuine, race-neutral motive for its strike based on venire member number six's alleged testimony regarding her expectation that a neighbor might testify at trial because the trial court's determination is not clearly erroneous. *See Nieto*, 365 S.W.3d at 680; *Gibson v. State*, 144 S.W.3d 530, 534 (Tex. Crim. App. 2004) (the *Batson* clearly-erroneous standard is a "highly deferential standard because the trial court is in the best position to determine whether a prosecutor's facially race-neutral explanation for a peremptory strike is genuinely race-neutral.").

---

[5] The trial court referred to venire member number six by name at this point.

Appellant does not challenge the State's final argument that it struck venire member number six based on her statement during voir dire that her husband disciplined their three-year-old stepson. Appellant has the ultimate burden of persuasion to establish by a preponderance of the evidence that the State's peremptory strike was the product of purposeful discrimination. *See Watkins*, 245 S.W.3d at 447. We determine that appellant has not established that the State's ostensibly race-neutral motive for its strike based on venire member number six's statement regarding the discipline of her stepson was a pretext for race-based discrimination. *See id.*

Finally, appellant asserts that the State did not explore its alleged concerns through specific questions addressed to venire member number six. While specific questions may have reinforced the trial court's finding of a genuine race-neutral motive for the State's strike, the strike is not proved to be racially motivated in the absence of such questions. *See Nieto*, 365 S.W.3d at 678 (upholding trial court's *Batson* determination despite the lack of individual questioning where the State explained that it struck a venire member because that member shared the same last name as a known criminal family and the venire member allegedly glared at the prosecutor).

We hold that the trial court did not clearly err in finding that the State's explanations for exercising its peremptory strike on venire member number six were genuine and, accordingly, concluding that appellant failed to meet his burden to establish by a preponderance of the evidence that the State purposefully discriminated on the basis of race when exercising a peremptory strike. *See Blackman*, 414 S.W.3d at 771. We overrule appellant's first issue.

## II.     Jury Instruction

In his second issue, appellant contends that the trial court erred by failing to

instruct the jury on the lesser-included offense of injury to a child.

## A. Standard of Review and Applicable Law

We apply a two-step test to determine whether appellant was entitled to an instruction on a lesser-included offense. *See Cavazos v. State*, 382 S.W.3d 377, 382-83 (Tex. Crim. App. 2012). The first step is a question of law, in which we compare the elements alleged in the indictment with the elements of the lesser offense to determine "if the proof necessary to establish the charged offense also includes the lesser offense." *Id.* at 382. Texas Code of Criminal Procedure article 37.09, entitled "Lesser included offense," states that an offense is a lesser-included offense if:

(1) it is established by proof of the same or less than all the facts required to establish the commission of the offense charged;

(2) it differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest suffices to establish its commission;

(3) it differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission; or

(4) it consists of an attempt to commit the offense charged or an otherwise included offense.

Tex. Code Crim. Proc. Ann. art. 37.09 (Vernon 2006).

The second step requires us to determine if there is some evidence in the record that would permit a rational jury to find that, if the appellant is guilty, he is guilty only of the lesser offense. *Cavazos*, 382 S.W.3d at 383; *see also Hall v. State*, 225 S.W.3d 524, 536 (Tex. Crim. App. 2007) ("[T]he evidence must establish the lesser-included offense as a valid, rational alternative to the charged offense.") (internal quotations omitted). A defendant is entitled to an instruction on a lesser-included offense "if some evidence from any source raises a fact issue

14

on whether he is guilty of only the lesser [offense], regardless of whether the evidence is weak, impeached, or contradicted." *Cavazos*, 382 S.W.3d at 383. "Although this threshold showing is low, it is not enough that the jury may disbelieve crucial evidence pertaining to the greater offense, but rather, there must be some evidence directly germane to the lesser-included offense for the finder of fact to consider before an instruction on a lesser-included offense is warranted." *Sweed v. State*, 351 S.W.3d 63, 68 (Tex. Crim. App. 2011) (internal quotations omitted). The standard may be satisfied "if some evidence refutes or negates other evidence establishing the greater offense or if the evidence presented is subject to different interpretations." *Id.*; *see Hall*, 225 S.W.3d at 536 ("[A]nything more than a scintilla of evidence may be sufficient to entitle a defendant to a lesser charge.").

**B.    Discussion**

The parties do not dispute the first step of the test to determine whether appellant was entitled to an instruction on the offense of injury to a child as a lesser-included offense of felony murder. Therefore, we assume without deciding that the first step was satisfied and proceed to the second step. *See Sweed*, 351 S.W.3d at 68 & n.4 (assuming without deciding that the first step was satisfied because the State did not assert failure to satisfy the first step as a ground for appellate review); *cf. Contreras v. State*, 312 S.W.3d 566, 584 (Tex. Crim. App. 2010) ("The offense of 'injury to a child' can qualify as an underlying felony in a felony murder prosecution."); *Martin v. State*, 246 S.W.3d 246, 265 (Tex. App.—Houston [14th Dist.] 2007, no pet.) ("Injury to a child is a lesser included offense of capital murder.").

A person commits a felony murder if he commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, he commits or attempts to commit an act clearly dangerous

15

to human life that causes the death of an individual. Tex. Penal Code Ann. § 19.02(b)(3) (Vernon 2011). A person commits the felony offense of injury to a child if he intentionally, knowingly, recklessly, or with criminal negligence by act or omission causes serious bodily injury or injury to a child. *Id.* § 22.04(a) (Vernon Supp. 2014); *see id.* § 22.04(e), (f), (g) (Vernon Supp. 2014) (the offense of injury to a child is a felony).

The second step requires us to consider whether there is any affirmative evidence from which a rational jury could have found that, if appellant was guilty, he was guilty only of the lesser-included offense of injury to a child, and not the greater offense of felony murder. *See Cavazos*, 382 S.W.3d at 383; *Hall*, 225 S.W.3d at 536. Appellant argues that his statements to police provide such evidence.

At the guilt-innocence phase of trial, the State played a recording, made on November 27, 2010, of a police interrogation of appellant. Appellant stated to police during his interrogation that he accidently dropped Indya onto the floor while he was holding her on November 26, 2010. Appellant stated that he raised Indya up to the height of his chin, and that Indya slipped from his grip accidently. Appellant stated that Indya may have fallen onto a hard plastic toy lying on the carpet. The interviewing detective told appellant that Indya's injuries were not consistent with a fall from an adult's arms. He encouraged appellant to be more forthcoming. Appellant stated in response that Indya cried after she fell to the floor. Appellant stated that he "patted her butt" and "shook her a little bit." He explained that he was trying to get Indya to stop crying. Appellant stated: "It was an accident . . . . I patted her too hard . . . . I ended up spanking her accidently . . . . On the abdomen. Accidently. Just that one time."

Appellant argues that his interview statements provide sufficient evidence to warrant a jury instruction on the lesser-included offense of injury to a child. Appellant stated during his interview that Indya fell out of his hands accidently. He argues that, although he claimed this fall was an accident, a jury could have considered the fall to be the result of appellant's reckless or negligent conduct and, therefore, he was entitled to a jury instruction on the offense of injury to a child. Appellant does not argue on appeal that the fall was an accident, as he stated in his interview.

We reject appellant's argument. The record does not provide evidence that Indya's fall was the result of appellant's reckless or negligent conduct; the record provides evidence only that Indya's fall was the result of an accident. If a jury attributed Indya's injuries to an accidental fall, then the jury would find appellant to be not guilty of both felony murder and injury to a child. *See* Tex. Penal Code Ann. § 19.03(b)(3); *id.* § 22.04(a) (a person commits the offense of injury to a child if he intentionally, knowingly, recklessly, or with criminal negligence causes serious bodily injury or injury to a child); *see also Williams v. State*, 294 S.W.3d 674, 681 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd) ("Appellant's testimony that she did not commit any offense cannot support a lesser-included offense instruction . . . . Appellant's evidence, if believed by the jurors, would have supported only an acquittal."). Therefore, appellant's statement is not germane to the lesser-included offense of injury to a child because, if believed, it tends to show that appellant is innocent of any offense. *See Sweed*, 351 S.W.3d at 68; *Bignall v. State*, 887 S.W.2d 21, 24 (Tex. Crim. App. 1994) ("If a defendant either presents evidence that he committed no offense or presents no evidence, and there is no evidence otherwise showing he is guilty only of a lesser included offense, then a charge on a lesser included offense is not required.") (emphasis removed).

17

Even if appellant's statement could be interpreted to provide more than a scintilla of evidence of his reckless or negligent conduct causing Indya's fall, the evidence would not permit a rational jury to find appellant guilty of only the lesser-included offense of injury to a child, and not the greater offense of felony murder. Felony murder does not require a culpable mental state. *See* Tex. Penal Code Ann. § 19.03(b)(3); *Johnson v. State*, 4 S.W.3d 254, 255 (Tex. Crim. App. 1999) ("The felony murder rule dispenses with the necessity of proving mens rea accompanying the homicide itself; the underlying felony supplies the culpable mental state."). Evidence of appellant's reckless or negligent conduct supports his felony murder conviction. *See Contreras*, 312 S.W.3d at 583-85 (upholding guilty verdict for felony murder based on the underlying felony offense of injury to a child because the jury was unanimous at least as to defendant's culpable mental state of criminal negligence for the offense of injury to a child).[6]

We hold that the evidence is insufficient to permit a rational jury to find that appellant is guilty only of the lesser-included offense of injury to a child, and not the greater offense of felony murder. Therefore, the trial court did not err in denying appellant's request for a jury instruction on the offense of injury to a child. *See Cavazos*, 382 S.W.3d at 382-383. We overrule appellant's second issue.

---

[6] Appellant also argues that his interview statements provide evidence that he "meant [his] actions [of striking Indya], but never intended the actual result." Appellant's interview statements regarding his striking of Indya do not support an instruction on the lesser-included offense of injury to a child because, regardless of whether appellant's statements tend to show that his actions were intentional, knowing, reckless, or negligent, his statements support his conviction for the greater offense of felony murder. *See* Tex. Penal Code Ann. §§ 19.03(b)(3), 22.04(a); *Contreras*, 312 S.W.3d at 583-85; *Johnson*, 4 S.W.3d at 255.

18

**CONCLUSION**

Having overruled appellant's two issues, we affirm the trial court's judgment.

/s/    William J. Boyce
        Justice

Panel consists of Chief Justice Frost and Justices Boyce and McCally.

Do Not Publish — Tex. R. App. P. 47.2(b).