**Reversed and Remanded and Opinion filed October 1, 2013.**



In The

# Fourteenth Court of Appeals

## NO. 14-12-00515-CR

### ROBERT NATHANIEL JONES, Appellant

### V.

### THE STATE OF TEXAS, Appellee

**On Appeal from the 177th District Court**
**Harris County, Texas**
**Trial Court Cause No. 1332397**

## O P I N I O N

Appellant Robert Nathaniel Jones challenges his felony conviction for possessing a controlled substance, arguing in his first issue that the State peremptorily struck an African-American veniremember in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). He contends that the trial court erred in denying his *Batson* challenge because the State's explanation for striking an African-American veniremember applied with identical force to three non-African-American

veniremembers who ultimately served on the jury.

The State explained that, after striking less favorable veniremembers, it used its final strikes against veniremembers who rated law enforcement in their community a "seven" on a scale of one to ten. According to the State, its strategy was to "str[ike] everybody who was a six [on law enforcement] and then everyone who was a seven, up until [it] got to the point of . . . [veniremember number] 26 or 27," where it "ran out of strikes"; it "took seven or lower and just moved up the scale from [veniremember number] one."

The trial court erred in accepting this explanation because it is contrary to the record. In striking veniremember number twenty-four, an African American, the State skipped over two non-African-American veniremembers with lower numbers who also gave law enforcement a score of seven. In addition, the State's strikes reveal disparate treatment of African-American veniremembers. Accordingly, we conclude the trial court clearly erred by finding that the State's explanation was genuine. We therefore reverse appellant's conviction and remand the case for a new trial.

## BACKGROUND

Appellant, an African American, was charged with third-degree felony possession of a controlled substance. At the beginning of voir dire, the venire consisted of sixty panelists. After challenges for cause, thirty-two veniremembers remained, three of whom are identified in the record as African American. No African-American members of the venire would go on to serve on the jury. Using its peremptory challenges, the State struck either two of the three African-American members (according to the record) or three of the four (according to the parties).[1] Appellant struck the remaining African-American veniremember

---

[1] In their briefs, both parties contend that the venire had four African-American members

2

because he was a police officer.

Following voir dire, appellant raised a *Batson* challenge based upon the State's strikes of two African-American veniremembers. On appeal, appellant challenges only one of those strikes, that of veniremember twenty-four.

When asked to justify its strikes, the State relied upon answers to two of its voir dire questions. The first question asked whether veniremembers "f[elt] possession of small amounts of marijuana . . . should be prosecuted." The second asked veniremembers to "rate law enforcement in [their] community on a scale of one to ten." The State contended that it "took [the answers to these two questions] and combined them" to determine which veniremembers to strike.

The State explained that because many veniremembers answered "no" to the marijuana question, it primarily emphasized law enforcement rankings. Specifically, the State sought to eliminate all veniremembers who rated law enforcement six or lower. A prosecutor summarized the approach that led to the strike of veniremember twenty-four as follows:

> We've stated to the Court our specific race neutral reasons, which we have proven. We did regardless of race, six or lower for law enforcement. Then we took seven or lower and just moved up the scale from [veniremember] one up until we got past. Sa[ve] for the [African-American] police officer . . . so, obviously these are race neutral reasons and we have proven to the Court these things.

Veniremember twenty-four answered "yes" to the question about prosecuting possession of small amounts of marijuana and gave law enforcement

---

after the challenges for cause. The parties appear to have identified the fourth African-American veniremember using juror information cards. Because the cards do not appear in the appellate record, however, we cannot rely upon the parties' representations regarding the race of the fourth veniremember. *See Vargas v. State*, 838 S.W.2d 552, 556 (Tex. Crim. App. 1992). As a result, we base our analysis upon the three African-American veniremembers that the record identifies. *See Young v. State*, 826 S.W.2d 141, 146 (Tex. Crim. App. 1991).

in her community a score of seven. Three non-African-American veniremembers gave identical answers, but the State did not strike them.[2] In addition, two of these non-African-American members had lower venire numbers than veniremember twenty-four, yet they were ultimately seated on the jury.[3] The trial court denied the *Batson* challenge, and appellant was convicted and sentenced to 30 years in prison. This appeal followed.

**ANALYSIS**

In his first issue, appellant argues that the State's facially race-neutral explanation does not account for its strike of veniremember twenty-four. We agree.

## I.    Standard of review

The Equal Protection Clause of the United States Constitution forbids counsel from exercising peremptory strikes on the basis of race. *Batson*, 476 U.S. at 89; *see* U.S. Const. amend. XIV, § 1. The exclusion of even one juror with racial motive invalidates the jury selection process and requires a new trial. *Davis v. Fisk Elec. Co.*, 268 S.W.3d 508, 521 (Tex. 2008). Typically, counsel do not have to explain or justify their strikes, unless a strike is challenged under *Batson. See Lewis v. State*, 911 S.W.2d 1, 4 (Tex. Crim. App. 1995); *see also* Tex. Code

---

[2] Member twenty-eight also gave identical answers and was seated on the jury but did not precede member twenty-four in the numerical order of the venire. We therefore consider member twenty-eight in our comparative analysis but not in evaluating the genuineness of the State's claim that it struck veniremembers in order.

[3] These are not the only inconsistencies between the State's proffered strategy and its strikes. For example, the State departed from its stated strategy of combining the marijuana question and the law enforcement question when it did not strike member number seven, who believed possession of small amounts of marijuana should not be prosecuted and gave law enforcement a score of seven. The State departed from its "strike-all-the-sixes" strategy when it did not strike veniremember fifteen, who gave law enforcement a score of six. Appellant's comparative analysis argument on appeal does not consider these members, so our analysis does not rely upon them.

4

Crim. Proc. Ann. art. 35.14 (West 2006).

Appellate courts review a trial court's ruling on a *Batson* challenge for clear error, focusing on the genuineness rather than the reasonableness of the prosecutor's explanation. *Nieto v. State*, 365 S.W.3d 673, 676 (Tex. Crim. App. 2012). We will not reverse a trial court's ruling unless we are left with a firm conviction that a mistake has been made. *Harris v. State*, 827 S.W.2d 949, 955 (Tex. Crim. App. 1992). The evidence offered at trial is viewed in the light most favorable to the trial court's ruling. *Williams v. State*, 804 S.W.2d 95, 101 (Tex. Crim. App. 1991). The trial court's ruling regarding purposeful discrimination is entitled to great deference because such a ruling often requires the court to evaluate the credibility and content of the State's explanation, as well as other surrounding facts and circumstances that the trial court is uniquely positioned to assess. *Alexander v. State*, 866 S.W.2d 1, 8 (Tex. Crim. App. 1993).

While we cannot simply substitute our judgment for that of the court below, we are not limited to the specific arguments presented at trial. *Id.* Instead, we review the voir dire record in its entirety. *Watkins v. State*, 245 S.W.3d 444, 448 (Tex. Crim. App. 2008).

## II. To prevail on his *Batson* challenge, appellant must show the trial court clearly erred in failing to find purposeful discrimination.

A *Batson* challenge consists of three steps. *Nieto*, 365 S.W.3d at 675–76 (citing *Hernandez v. New York*, 500 U.S. 352, 358 (1991)). First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. *Id.* Second, if the necessary showing has been made, the burden shifts to the State to articulate a race-neutral reason for striking the veniremember in question. *Id.* Third, the trial court must determine whether the defendant has proved purposeful discrimination. *Id.*

5

## A.  Step one: The prima facie case inquiry is moot.

At trial, appellant attempted to make a prima facie case for racial discrimination by showing that the State disproportionately utilized peremptory strikes against African-American veniremembers.  The record indicates that the State expended twenty percent of its strikes to remove African-American veniremembers, who represented just over ten percent of the eligible venire.  In so doing, the State eliminated sixty-six percent of African-American veniremembers—two out of three.

To prevail on a *Batson* challenge, the aggrieved defendant need not demonstrate multiple instances of racial discrimination in jury selection.  *Linscomb v. State*, 829 S.W.2d 164, 166 (Tex. Crim. App. 1992).  Evidence that the number of peremptory strikes used against an identifiable racial group exceeds what would be expected if race had nothing to do with the strikes may be sufficient to establish the prima facie case.  *Id.*  Racial disparity alone will not always establish a prima facie case, however, particularly if, as here, the sample size is small.  *See Hassan v. State*, 369 S.W.3d 872, 876 (Tex. Crim. App. 2012).

Ultimately, we need not decide whether appellant made a prima facie case.  Rather than disputing appellant's argument for a prima facie case, the State offered an explanation for its strikes to the trial court.  In so doing, the State rendered this step of the analysis moot.  *See Simpson v. State*, 119 S.W.3d 262, 268 (Tex. Crim. App. 2003).

## B.  Step two: The State provided a facially race-neutral explanation for its peremptory strikes.

Turning to the second step, we conclude that the State's explanation for striking veniremember twenty-four is facially race neutral.  A race-neutral explanation is one based on something other than the race of the veniremember.

6

*Hernandez*, 500 U.S. at 360. At this step of the inquiry, the issue is simply the facial validity of the prosecutor's explanation. *Id.* Unless discriminatory intent is inherent in the explanation, the offered reason is race neutral. *Id.*

Here, the State explained its strikes as a simple process of elimination based on the ratings that veniremembers returned for their local law enforcement. Because race plays no overt role in this explanation, it is facially race neutral.

### C. Step three: We review the trial court's decision regarding purposeful discrimination for clear error.

In the third step, the court must determine whether the defendant proved purposeful discrimination. The issue before us, then, is whether the trial court clearly erred in failing to find purposeful discrimination in the State's use of peremptory strikes. The trial judge must evaluate the facially race-neutral reasons given by the prosecutor to determine whether those explanations are genuine or merely a pretext for purposeful discrimination. *Whitsey v. State*, 796 S.W.2d 707, 713 (Tex. Crim. App. 1989).

A number of factors, if present, tend to show purposeful discrimination. *Miller-El v. Dretke*, 545 U.S. 231, 240–63 (2008). While not determinative, "the presence of any *one* of these factors tends to show that the State's reasons are not actually supported by the record or are an impermissible pretext." *Whitsey*, 796 S.W.2d at 714.

One of these factors is disparate treatment of veniremembers, which exists when the State's explanations for eliminating members of a particular racial group apply equally well to members of another race who were not eliminated. *Watkins*, 245 S.W.3d at 448–49. Courts identify disparate treatment using a side-by-side comparison, or "comparative analysis," of veniremembers of a particular race who were struck and members of other races who were not struck. *See Miller-El v.*

7

*Dretke*, 545 U.S. at 232.  If the reason a prosecutor gives for striking an African-American veniremember applies just as well to a non-African-American member allowed to serve on the jury, that fact is evidence tending to show disparate treatment.  *See id.*

Another factor that may indicate purposeful discrimination is the extent to which the record contradicts the State's explanation for its strikes.  *See Greer v. State*, 310 S.W.3d 11, 18 (Tex. App.—Dallas 2009, no pet.) ("[T]he State's reliance on an explanation that is contradicted by the record is persuasive evidence that its stated reason for striking [a veniremember] was pretextual.").  *Batson* affords the State an opportunity to give its reason for striking a veniremember, but requires the court to "assess the plausibility of that reason in light of all evidence with a bearing on it." *Miller-El v. Dretke*, 545 U.S. at 252.  If the record shows the State's reason to be false, it is more likely to be a pretext for discrimination.  *See Moore v. State*, 265 S.W.3d 73, 87–88, 90 (Tex. App.—Houston [1st Dist.] 2008), *pet. dism'd, improvidently granted*, 286 S.W.3d 371 (Tex. Crim. App. 2009) (per curiam) (finding a *Batson* violation based, in part, on prosecutor's misrepresentation that similarly situated juror of another race was also stricken).

III.    **Comparative analysis and the State's explanation for its strikes demonstrate purposeful discrimination in striking veniremember twenty-four.**

Analyzing *Batson*'s third step using these principles, we hold that the record supports appellant's contention that the State's explanation for striking African-American veniremembers applies equally to non-African-American veniremembers it did not strike.  Moreover, the record shows the State's explanation is not genuine because the State did not follow it.  The State did not begin with the first veniremember and strike all who gave law enforcement a score of seven because it struck veniremember twenty-four while leaving members eight

8

and thirteen, who gave the same response. Based on this disparate treatment, as well as the inconsistency between the State's explanation and its actual strikes, we conclude that the trial court's failure to find purposeful discrimination was clearly erroneous.

### A. A comparative analysis of the State's strikes, based on the veniremembers' answers during voir dire, indicates purposeful discrimination.

Disparate treatment occurs when persons of a different race who share "the same or similar characteristics as the challenged juror were not struck." *Whitsey*, 796 S.W.2d at 713. To show disparate treatment, an appellant may analyze evidence in the record to compare veniremembers struck by the State with veniremembers whom the State did not strike. *See Miller-El v. Cockrell*, 537 U.S. 322, 331 (2003). Texas courts and the United States Supreme Court have recognized that a comparative analysis showing purposeful discrimination can establish a *Batson* violation. *See, e.g., Snyder v. Louisiana*, 552 U.S. 472, 485 (2008); *Vargas v. State*, 859 S.W.2d 534, 534–35 (Tex. App.—Houston [1st Dist.] 1993, pet. ref'd).[4]

Comparative analysis is important because where "a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar

---

[4] On appeal, appellant may make a comparative analysis argument not presented at trial if it is manifestly grounded in the record. Any argument made on appeal from a *Batson* challenge must be based on "evidence presented to the trial judge during voir dire and the *Batson* hearing." *Young*, 826 S.W.2d at 145. But a reviewing court "need not limit itself to arguments or considerations that the parties specifically called to the trial court's attention so long as those arguments or considerations are manifestly grounded in the appellate record." *Watkins*, 245 S.W.3d at 448. Allowing appellant to present a more comprehensive comparative analysis in support of his *Batson* claim on appeal is merely to allow him "to argue *what is in evidence* from the voir dire and the *Batson* hearing and *why he should prevail* on his *Batson* claim." *Young*, 826 S.W.2d at 146. Accordingly, we consider appellant's comparative arguments on appeal to the extent they are grounded in the record.

nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." *Miller-El v. Dretke*, 545 U.S. at 241. We need not compare only veniremembers that exhibit identical characteristics. *See id.* at 247 n.6. If the State asserts that it struck an African-American veniremember with a particular characteristic, yet it also accepted non-African-American members with that same characteristic, this is evidence that the asserted justification was a pretext for discrimination, even if the two members are dissimilar in other respects. *Reed v. Quarterman*, 555 F.3d 364, 375 (5th Cir. 2009) (citing *Miller-El v. Dretke*, 545 U.S. at 241). Also, we must consider only the State's explanation for striking an African-American veniremember and compare that explanation with its treatment of non-African-American members. *Miller-El v. Dretke*, 545 U.S. at 252; *see also Emerson v. State*, 851 S.W.2d 269, 274 (Tex. Crim. App. 1993) (holding that any "explanation for striking a prospective minority [veniremember] is . . . suspect when the state does not strike persons with same or similar characteristics").

In this case, the State explained its decision to use one of its final strikes against veniremember twenty-four, an African-American female, as the simple application of a numeric system. The State asserted that veniremembers who gave scores of either six or seven, when asked to rate law enforcement in their communities on a scale from one to ten, were identified for removal. According to the State, all veniremembers who responded with ratings of six were struck first. Then, with only a few remaining strikes, the State proceeded to strike those who gave law enforcement in their communities a score of seven. They began these strikes, the State asserts, at the beginning of the venire and continued in order until their strikes were exhausted.

The State's reasons for striking veniremember twenty-four ring hollow

10

because they apply equally to three non-African-American veniremembers whom the State allowed to serve on the jury. As explained in detail below, veniremembers eight, thirteen, twenty-four, and twenty-eight provided identical answers to the relevant questions in voir dire. But the State struck only veniremember twenty-four, the sole African American in this group. The State's disparate treatment of these four similarly situated veniremembers indicates purposeful discrimination.

The State began its voir dire by asking the venire to rate current drug laws on a scale from one to three—one being too harsh, two being proper, and three being too lenient. Veniremember eight answered two, member thirteen answered two, member twenty-four answered two, and member twenty-eight answered two. All four gave the same one-word response.

Next, the State asked the venire whether possessing a small amount of marijuana should be a criminal offense. Member eight replied that it should, as did members thirteen, twenty-four, and twenty-eight. All four gave the same one-word response.

Then, the State asked the venire to rate law enforcement in their respective communities from one, being poor, to ten, being excellent. Member eight gave his community's law enforcement a rating of seven. Member thirteen also answered seven. Member twenty-four did the same, as did member twenty-eight. All four offered an identical, one-word response.

Finally, the State asked the venire if they would require the prosecutor to prove beyond a reasonable doubt that the drugs were found on the defendant's actual body. Members eight, thirteen, twenty-four, and twenty-eight were silent. The veniremembers who spoke up or answered yes were struck for cause.

Appellant's trial counsel then questioned the panel. First, counsel asked if anyone would ascribe additional credibility to the testimony of a police officer by virtue of his or her status. Veniremembers eight, thirteen, twenty-four, and twenty-eight remained silent. The members who spoke up or answered yes were struck for cause.

In his final question, appellant's counsel asked if anyone had a close friend or family member in law enforcement. This is the only time that members eight, thirteen, twenty-four, and twenty-eight gave different answers. Members thirteen, twenty-four, and twenty-eight answered no. Member eight, on the other hand, answered yes.

In sum, members thirteen, twenty-four, and twenty-eight provided identical answers to all questions asked of them. Member eight answered in lockstep with the others until asked whether he had friends or family in law enforcement. For our purposes, member eight's single departure from otherwise-perfect uniformity with the others is immaterial. Both members eight and thirteen were seated on the jury because the State did not strike either member, indicating that the State itself did not recognize a meaningful distinction between the two based on their responses to defense counsel's final question.

This comparative analysis shows that State struck an African-American veniremember who gave certain answers to the voir dire questions, yet it did not strike three non-African-American members who gave identical answers to the relevant questions. This evidence indicates that the State's asserted explanation for its strike was a pretext for discrimination. *See Reed*, 555 F.3d at 375.

The Dallas Court of Appeals reached a similar conclusion in *Young v. State*, 848 S.W.2d 203 (Tex. App.—Dallas 1992), *pet. ref'd*, 856 S.W.2d 175 (Tex. Crim. App. 1993). In that case, the State struck seven African-American veniremembers

12

from the panel. When challenged, the State asserted that it had struck one of these members because he had an uncle who had been in trouble with the law. *Id.* at 206. The State did not strike a non-African-American member whose brother had been charged with theft, however. *Id.* at 207. A comparative analysis of the member struck with the member retained left the court "with the definite and firm conviction that the trial court made a mistake." *Id.* at 210. In remanding for a new trial, the court reiterated that "[o]ne peremptory challenge for racially motivated reasons invalidates the entire jury selection process." *Id.*

Disparate treatment may not automatically be inferred from every situation in which the State's reasons for striking a veniremember apply to another veniremember that the State did not strike. *Cantu v. State*, 842 S.W.2d 667, 689 (Tex. Crim. App. 1992). It may be the case, for example, that two veniremembers possess the same objectionable attribute or character trait, but not in the same degree. *Id.* Here, however, four veniremembers gave *identical* answers to the relevant questions and presented *identical* objectionable traits, but the State struck only one—the African American. We hold that the State's strike of veniremember twenty-four when it seated three non-African-American veniremembers with identical material answers indicates discriminatory intent.

### B. The record shows that the State's explanation of its strikes is not genuine.

As discussed above, a second factor that indicates purposeful discrimination is the State's reliance on an explanation for its strikes that is contradicted by the record. This factor is also present.

In the *Batson* hearing, the two prosecutors initially gave unclear, and apparently uncoordinated, explanations for striking African-American veniremember twenty-four. The first prosecutor justified the strike as follows:

[FIRST PROSECUTOR]: Juror No. 24, I chose to use a strike on because she said that --

THE COURT: Either of those reasons for which you didn't strike other people?

[FIRST PROSECUTOR]: No. I mean, I struck -- I made a whole list of six or lower on law enforcement. Then I got to a point where I had two more strikes to make and I had to -- because they had been eliminated for cause, these other people I was going to strike. So, I went ahead and I struck 24 because she answered a 7 for law enforcement in her community. So, that's why I made that decision.

This explanation is incomplete because it does not address why the State struck veniremember twenty-four but did not strike non-African-American members eight, thirteen, and twenty-eight—each of whom gave identical answers to the law enforcement question and other relevant questions.

As the exchange with the defense and the trial judge continued, the second prosecutor restated the State's explanation, adding that the State struck all veniremembers who gave law enforcement a score of seven up until it reached veniremember twenty-six or twenty-seven:

[SECOND PROSECUTOR]: We left an African American juror on there who was a seven because --

[FIRST PROSECUTOR]: He's a police officer.

[SECOND PROSECUTOR]: -- we went past him and we struck the sevens from there. So, we used sevens and sixes on our law enforcement and struck them, everybody who was a six and then everyone who was a seven, up until we got to the point of 20 -- looks like 26 or 27. Then we ran out of strikes. So, there was nothing to do with the race. It was all based upon the law enforcement question.

The State also noted that it did not strike member eighteen, the African-American police officer who gave law enforcement a score of seven, because it assumed (correctly, as it turned out) that appellant's counsel would strike him.

14

Later, the second prosecutor reiterated that the State struck all veniremembers who rated law enforcement with a score of seven in numerical order:

> [SECOND PROSECUTOR]: We've stated to the Court our specific race neutral reasons, which we have proven. We did regardless of race, six or lower for law enforcement. Then we took seven or lower and just moved up the scale from one up until we got past. Sa[ve] for the police officer, like defense counsel said, [who] was African American . . . . [O]bviously these are race neutral reasons and we have proven to the Court these things.

Taking these assertions together, the State explained that it exercised its strikes by moving up through the panel in numerical order—beginning with veniremember one—and striking all members who gave law enforcement a score of seven. If the State's explanation were genuine, it would have struck veniremembers eight and thirteen, both of whom had lower panel numbers and answered seven on the law enforcement question.[5] But it did not. Veniremembers eight, thirteen, and twenty-four gave identical answers to each relevant question in voir dire, yet the State struck only member twenty-four. The State's misstatement that it exercised its strikes in panel order on members who gave law enforcement a score of seven, when in fact it did not, "presented the trial court with a flawed basis on which to evaluate" the State's explanation. *See Moore*, 265 S.W.3d at 90.

For these reasons, we conclude that the State offered a reason for striking veniremember twenty-four that is contradicted by the record. This fact also supports an inference of purposeful discrimination. *See Greer*, 310 S.W.3d at 18 ("[T]he State's reliance on an explanation that is contradicted by the record is

---

[5] Veniremember eight indicated either kinship or friendship with a member of law enforcement, but the State did not mention that fact as a reason for not striking the member. In any event, that fact cannot explain the State's failure to strike veniremember thirteen, who admitted no such affinity but also gave law enforcement a score of seven.

15

persuasive evidence that its stated reason for striking [an African-American veniremember] was pretextual."); *Moore*, 265 S.W.3d at 88 ("[T]he State represented to the trial court that it had struck [a veniremember] when in fact it had not[,] . . . bring[ing] the genuineness of the State's proffered race-neutral reason into question.").

### C.    Other courts have found *Batson* violations on similar facts.

Both Texas and federal courts have found purposeful discrimination in similar cases where the record contradicted the prosecutor's explanation and a comparative analysis indicated the explanation was pretextual.    In *Snyder v. Louisiana*, for example, eighty-five veniremembers were questioned in voir dire. 552 U.S. at 475.   Thirty-six survived challenges for cause, five of whom were African American. *Id.* at 476.   The prosecutor struck all five, but the United States Supreme Court focused its comparative analysis on just one. *Id.* at 478.

Responding to defense counsel's prima facie showing, the prosecutor offered the following race-neutral reason for the strike: the member was a student teacher who indicated that he might be burdened by missing class, so he might convict on a lesser charge in order to avoid the penalty phase.[6] *Id.*  The prosecutor did not strike two non-African-American veniremembers with similarly pressing obligations, however. *Id.* at 483–84.   The first, a self-employed general contractor, had two construction projects nearing completion, one with occupants soon to move in. *Id.* at 483.   He believed that service on the jury would delay the move. *Id.* at 483–84.   He also indicated that he needed to care for his children because his wife had recently undergone major surgery. *Id.* at 484.   The second non-African-

---

[6] The State also asserted that the member looked nervous throughout voir dire.  Because the trial judge made no recorded determination of the member's demeanor, however, the court could not presume that the trial judge credited the prosecutor's assertion that he was nervous. *Snyder*, 552 U.S. at 479.

American member also had an important work commitment, at which his presence was crucial, later in the week. *Id.* The court concluded that these comparisons helped to show "the implausibility of [the prosecutor's] explanation." *Id.* at 483.

The court also noted the inconsistency between the prosecutor's concern that the African-American veniremember would rush the verdict and the prosecutor's statements recognizing that the trial would be short—it was only three days from the beginning of voir dire to the trial's conclusion. *Id.* at 482. Because the record showed the member's supervisor had promised to work with the member to make up missed time, the court concluded that the prosecutor's justification for the strike was "suspicious." *Id.* at 483.

Considering all the circumstances, the court held that the "prosecution's proffer of this pretextual explanation naturally gives rise to an inference of discriminatory intent." *Id.* at 485. Thus, the trial judge clearly erred in rejecting the *Batson* objection. *Id.* at 474.

In *Moore v. State*, the First Court of Appeals likewise concluded that a comparative analysis and an unsupported explanation demonstrated discriminatory intent. 265 S.W.3d at 79–86. In that case, the State struck seven African American veniremembers, one of whom was a 45-year-old female. The State explained that it struck her based on her age, her gender, her lack of children, and her inclusion of question marks on several areas of her jury questionnaire, possibly indicating confusion. *Id.* at 86. The State did not strike one non-African-American female who was also childless, nor did it strike one non-African-American veniremember who did not respond fully to the questionnaire. *Id.* at 86–88. Finding no meaningful difference between a failure to respond and the inclusion of question marks, the court concluded that "this disparity [brought] the genuineness of the State's proffered race-neutral reason into question." *Id.* at 88.

17

The State also said that it struck at least one non-African-American veniremember with similar characteristics to the African-American member in question. *Id*. at 88, 90. That statement was not supported by the record, however, further eroding the genuineness of the State's explanation. *Id.* Considering these and other factors together, the court held that the appellant met his burden to establish a *Batson* violation. *Id.* at 90.[7]

The case under review presents similar facts. We have an explanation that comparative analysis reveals to have been disparately applied, indicating discriminatory intent. The veniremembers we have considered responded not merely with similar answers, but with *identical* answers to the relevant voir dire questions. The State struck an African-American veniremember, offering an explanation that applied equally to non-African-American veniremembers it did not strike. The State's explanation for striking veniremember twenty-four applies to non-African-American veniremembers eight, thirteen, and twenty-eight who were seated on the jury. No identifiable characteristic other than race distinguishes these veniremembers.

We also have a record that shows the State's explanation is not genuine. The State could not have struck veniremembers who gave their local law enforcement a score of seven in panel order because veniremember twenty-four was struck while veniremembers eight and thirteen—who gave the same numeric score—were not.

For these reasons, we hold that appellant has met his burden to establish a *Batson* violation. Accordingly, we sustain appellant's first issue and hold that the

---

[7] The court in *Moore* also conducted a disproportionate strike analysis, observing that the State used its ten peremptory strikes to exclude six of the seven African-Americans. 265 S.W.3d at 88. The court further noted that the State failed to meaningfully question struck veniremembers. *Id.* at 89–90.

trial court clearly erred when it denied appellant's *Batson* challenge.

## CONCLUSION

Having sustained appellant's *Batson* issue, we reverse the judgment of the trial court and remand the case for a new trial. We do not reach appellant's second issue, which challenges the award of court costs, because we have reversed the judgment imposing those costs.

/s/    J. Brett Busby
          Justice

Panel consists of Chief Justice Frost and Justices Brown and Busby.

Publish —Tex. R. App. P. 47.2(b).