**Opinion issued August 29, 2019**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-18-00109-CR

_____

**COREY DEMOND COLEMAN, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

On Appeal from the 434th District Court
Fort Bend County, Texas
Trial Court Case No. 13-DCR-064586

## MEMORANDUM OPINION

Corey Coleman was convicted of murder and sentenced to 34 years' confinement. *See* TEX. PENAL CODE § 19.02(b). In five issues, Coleman contends that (1) the evidence is legally insufficient to support his conviction, (2) the trial court abused its discretion in overruling his objection to testimony concerning the

"ultimate question" of Coleman's guilt, (3) the trial court abused its discretion in overruling his objection to testimony concerning Coleman's gang affiliation, (4) the trial court abused its discretion in overruling his objection to inherently prejudicial courthouse decorations, and (5) the trial court erred in denying two of his *Batson* challenges.

We affirm.

## Background

### *The police are dispatched to the scene of a gun homicide*

This case arises from a gang-related shooting. On September 26, 2013, just before midnight, the police received a dispatch for shots fired in the Lakemont subdivision in Richmond, Texas. When they arrived, they discovered a deceased male, later identified as George Kemp, age 20, lying face down in a pool of blood. He had been shot five times. At the scene, the police recovered ballistics evidence, discussed more thoroughly below, establishing that two types of handguns had been fired that night: (1) a 9-millimeter semiautomatic pistol and (2) a revolver of either .38 or .357 caliber.

### *The police investigate and conclude that Coleman was one of the shooters*

The police proceeded to interview several witnesses and received several tips. They determined that two groups of young men, most of them teenagers, had met that night for a fight. On the one hand, there was a group led by B. Dilworth, which

included K. Molo, D. Lewis, and Kemp. On the other hand, there was a group led by B. Lacour, which included S. Spence, C. Coleman, and at least three other young men, identified inconsistently throughout the record.

The police then interviewed the members of each group and further determined that, earlier in 2013, Dilworth and Lacour became embroiled in some sort of dispute, which led to Dilworth challenging Lacour to a fight. This, in turn, led to the two groups meeting in the Lakemont subdivision the night of the shooting. A fight ensued, and, at some point, Lacour yelled for someone in his group to shoot Dilworth. Coleman, armed with a 9mm semiautomatic pistol, and another member of Lacour's group, armed with some sort of revolver, then fired multiple shots, at least some of which hit Kemp, killing him.

### Coleman is indicted, tried, and convicted

Coleman was indicted and tried for murder. The State argued that the evidence showed that the gunman with the revolver shot Kemp at least three times and that Coleman shot Kemp at least once. The jury found Coleman guilty of murder, and the trial court signed a judgment of conviction sentencing him to 34 years' confinement. Coleman appeals.

## Legal Sufficiency

In his first issue, Coleman contends that there is legally insufficient evidence to support the jury's verdict finding him guilty of murder.

## A.    Standard of review

When reviewing the sufficiency of the evidence, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979); *see Adames v. State*, 353 S.W.3d 854, 859 (Tex. Crim. App. 2011) (holding that *Jackson* standard is only standard to apply to determine sufficiency of evidence). The jury is the exclusive judge of the facts and the weight to be given to the testimony. *Bartlett v. State*, 270 S.W.3d 147, 150 (Tex. Crim. App. 2008). As the sole judge of credibility, the jury may accept one version of the facts and reject another, and it may reject any part of a witness's testimony. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986).

We afford almost complete deference to the jury's credibility determinations. *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008). We may not reevaluate the weight and credibility of the evidence or substitute our judgment for that of the factfinder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Rather, we determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Thornton v. State*, 425 S.W.3d 289, 303 (Tex. Crim. App. 2014) (quoting *Jackson*, 443 U.S. at 319). We resolve

any inconsistencies in the evidence in favor of the verdict. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

Circumstantial evidence is as probative as direct evidence in establishing guilt, and circumstantial evidence alone can be sufficient to establish guilt. *Sorrells v. State*, 343 S.W.3d 152, 155 (Tex. Crim. App. 2011). "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

**B.     Analysis**

The trial court's charge instructed the jury to find Coleman guilty of murder upon finding that Coleman either (1) intentionally or knowingly caused Kemp's death by shooting Kemp with a firearm or (2) caused Kemp's death by shooting Kemp with a firearm with intent to cause Kemp serious bodily injury. *See* TEX. PENAL CODE § 19.02(b)(1), (2). At trial, the State's principal evidence consisted of (1) the testimony of the firearms examiner who analyzed the ballistics evidence recovered from Kemp's body and the crime scene, (2) the testimony of the medical examiner who performed the autopsy of Kemp's body, (3) the testimony of four eyewitnesses, and (4) the recorded statement Coleman made to the police shortly after the murder. We discuss each category of evidence in turn, starting with the firearm examiner's testimony.

5

**The firearms examiner's testimony.** For context, the firearms examiner began by providing a brief summary of the components of a firearms cartridge—i.e., the components of a live, unfired round of ammunition. She explained that a cartridge is made up of four principal components. First, there is the bullet, also called the projectile, which is the component that is actually fired out of the gun. A projectile, she explained, is either jacketed or unjacketed. An unjacketed projectile is typically made of solid lead, whereas a jacketed projectile consists of a lead core incased (jacketed) in another metal, usually brass or copper. Both semiautomatics and revolvers use jacketed cartridges, but typically only revolvers use unjacketed cartridges. Second, there is the powder, which is the substance that propels the bullet from the gun. Third, there is the primer, which is the substance that ignites the powder. Fourth, there is the casing, which holds the bullet, powder, and primer together.

The firearms examiner then discussed the ballistics evidence she received for analysis. The evidence consisted of (1) three fired 9mm Luger cartridge casings, which were recovered from the crime scene, (2) one unfired 9mm Luger cartridge, which was also recovered from the crime scene, (3) two fired lead bullets, one of which was recovered from Kemp's neck during his autopsy, and one of which was recovered near Kemp's body at the crime scene, (4) a fired copper bullet jacket packaged with a lead bullet core, which were recovered from Kemp's ribcage and

liver during his autopsy, and (5) a fired copper bullet jacket fragment packaged with a lead bullet core, which were found underneath Kemp's body at the crime scene.

The firearms examiner testified that, in her opinion, the three fired 9mm Luger cartridge casings were fired from the same unknown 9mm Luger semiautomatic pistol; the two fired lead bullets were fired from a .38 Special or .357 Magnum revolver;[1] and the fired copper bullet jacket and fired copper bullet jacket fragment were both fired from the same unknown .38 Special or .357 Magnum revolver. The firearms examiner ultimately concluded that the ballistics evidence came from two handguns: a 9mm Luger semiautomatic pistol and a .38 Special or .357 Magnum revolver.

**The medical examiner's testimony.** The medical examiner who performed the autopsy testified that Kemp suffered five gunshots wounds, three of which were perforating, meaning the projectile exited Kemp's body, and two of which were penetrating, meaning the projectile did not exit Kemp's body.

The medical examiner testified that Kemp suffered perforating gunshot wounds to his right thigh, left buttock, and left backside. The medical examiner did not have an opinion as to the type of gun or caliber of projectile that caused these perforating wounds. The medical examiner testified that Kemp suffered a

---

[1] The firearms examiner noted, however, that she could not determine, one way or the other, whether the bullets were fired from the same revolver.

7

penetrating gunshot wound to the right side of his neck, which was caused by an unjacketed lead projectile recovered from the soft tissue in the back of his neck. The medical examiner further testified that Kemp suffered another penetrating gunshot wound to the right side of his back, which was caused by a jacketed lead projectile that separated upon entrance. The lead core was recovered from Kemp's liver, and the copper jacket was recovered from Kemp's ribcage. Finally, the medical examiner testified that he did not find any stippling or soot on Kemp's wounds, which, in the medical examiner's opinion, showed that Kemp was not shot at close range.

The medical examiner ultimately concluded that Kemp's cause of death was multiple gunshot wounds and his manner of death was homicide. The medical examiner did not have an opinion as to how many guns were involved or the order in which Kemp was shot.

**The eyewitnesses' testimony.** Four eyewitnesses testified, three from Dilworth's group and one from Lacour's group. From Dilworth's group, the jury heard testimony from Dilworth himself, Molo, and Lewis. And from Lacour's group, the jury heard testimony from Spence. Each witness gave slightly different, and at times conflicting, accounts of what happened.

Dilworth testified that he was 17 years old the night of the shooting. Kemp was his cousin, and the two of them were close. On the night of the shooting, he met Kemp and Lewis at a high school football game. His plan that evening was to fight

8

Lacour. Dilworth knew Lacour from high school, and the two were not friends. According to Dilworth, Lacour and several other men had "jumped" his cousin a few months earlier, which had prompted Dilworth to challenge Lacour to fight.

Dilworth testified that Kemp, Lewis, and he got into Kemp's silver Mercury Sable and drove to a nearby Whataburger, where Dilworth and Lacour had agreed to meet for the fight. But Lacour never showed up, and Dilworth, Kemp, and Lewis eventually drove to Lakemont, which is where Lacour lived. Once inside the subdivision, they picked up their other friend, Molo, who also lived in Lakemont. They then drove to Lacour's block, where they met Lacour and a group of his friends, who pulled up in a gold Honda Accord driven by Lacour. Dilworth testified that no one in his group brought any weapons because they did not think they had to—they believed the two groups were meeting so that Dilworth and Lacour could have a one-on-one fist-fight.

Dilworth testified that, when Lacour and his group got out of their car, Lacour ran up to Dilworth, and the two began fighting while the others watched. Dilworth landed a few punches, and Lacour fell to the ground. Lacour got back up and tried to continue fighting Dilworth, but Dilworth continued to get the best of him, and Lacour yelled for one of his friends to "shoot him"!

Dilworth testified that he observed two gunmen in Lacour's group, one with a black and silver semiautomatic pistol, and one with some other kind of handgun. Dilworth identified the former as Coleman. He did not specifically identify the latter.

According to Dilworth, when Lacour yelled for someone to "shoot him," the comment was directed specifically at Coleman. But Coleman did not shoot right away. Instead, the fight continued for a few more seconds and eventually broke up. Then one of the members of Lacour's group ran toward Dilworth's group, and Kemp punched him—and it was at this point that Coleman and the other gunman opened fire.

Dilworth testified that Coleman's initial shot appeared to be pointed toward the ground. He did not say whether he observed at whom or what the other gunman initially fired. Once the initial shots were fired, Dilworth and the other members of his group took off running. And while he was running, Dilworth heard, but did not see, five or six additional gunshots.

Molo testified that he was 17 years old the night of the shooting. He testified that no one in his group was armed that night because they did not expect anyone from Lacour's group to be armed—they just thought Lacour and Dilworth were going to fight each other one-on-one.

Molo testified that, once Lacour and the members of his group got out of Lacour's vehicle, Dilworth and Lacour "squared up" and "started fighting."

Dilworth "g[ot] the best of" Lacour, knocking him to the group. Lacour then got up and yelled for someone to "[s]hoot this n-----"!

Molo testified that he then noticed a member of Lacour's group, whom he later identified as Coleman, armed with a semiautomatic pistol. But Coleman did not immediately open fire. Instead, Lacour and Dilworth continued to fight for about ten more seconds—and it was at this point that Coleman began to fire the handgun "into the air" and everyone "took off running." Molo testified that, as he ran, he heard three or four additional gunshots but did not see at whom or what they were fired.

Lewis testified that he was 17 or 18 years old the night of the shooting. According to Lewis, once Lacour's group arrived, Lacour and Dilworth fought one-on-one for several minutes, with neither getting the best of the other.

Suddenly, the fight turned into a "brawl" between various members of each group. Lewis testified that, at this point, he noticed one of the members of Lacour's group holding a handgun. Lewis testified that he could not tell whether the gun was a semiautomatic or a revolver. Lewis tried to warn the members of his group, but nobody heard him, and the fight continued. Then Lewis heard someone yell, "F---this shit!" and the man with the gun began shooting.

Lewis testified that he did not see where or at whom or what the man was shooting. Once the first shots were fired, Lewis turned around and ran. And while running, he heard three or four additional shots.

11

Lewis admitted that he failed to identify Coleman as the gunman from a photo lineup shown to him by the police. Lewis testified that he did not know either way whether Coleman fired a gun that night, but he was certain that Coleman was there fighting.

Spence testified that he was 14 years old the night of the shooting. He further testified that he did not have a gun that night and that he did not realize other members of his group were armed when they drove to Lakemont. Spence thought the two groups were meeting just so Dilworth and Lacour could fight each other one-on-one.

Spence testified that the altercation began as a fight between just Dilworth and Lacour but that it eventually turned into a "brawl" between the two groups. And as the two groups fought each other, Spence continued, gunshots suddenly began to go off, and he ducked for cover. Once the gunshots stopped, he stood up and observed one of the members of his group, whom he later identified as Coleman, with a semiautomatic pistol. And he observed another member of his group with some sort of revolver. Spence testified that Lacour, Coleman, the other gunman, and he then ran back to Lacour's vehicle, got in, and drove off. While in the car, Spence again observed Coleman with a semiautomatic pistol and the other gunman with some sort of revolver.

**Coleman's recorded statement.** While the investigation was underway, the police received several tips implicating Coleman in Kemp's murder, and they interviewed him. The interview was recorded and played for the jury at Coleman's trial. During the interview, Coleman initially denied any involvement whatsoever and provided an alibi for his whereabouts the night of the murder. But when the police confronted him with evidence contradicting his initial account, he proceeded to make a series of admissions. First, he admitted to being present at the fight the night of the murder. Then, he admitted that the members of his group had brought two handguns to the fight. Finally, he admitted to handling one of the handguns on the car ride to Lakemont. But he denied shooting Kemp. Coleman claimed that another member of the group—Spence, who was then 14 years old—shot Kemp.

From this evidence, a rational factfinder could have made at least four key findings.

First, a rational factfinder could have found that, on the night of the murder, two members of Lacour's group arrived at Lakemont armed with handguns: Coleman, who was armed with a 9mm semiautomatic pistol, and another individual, who was armed with a .38 Special or .357 Magnum revolver. The ballistics evidence showed that a 9mm semiautomatic pistol and .38 Special or .357 Magnum revolver were fired that night. Dilworth, Molo, and Spence each testified that Coleman was armed with a semiautomatic pistol. Dilworth and Spence each testified that another

member of Dilworth's group was armed with some sort of revolver. Lewis likewise testified that he observed another member of Lacour's group (not Coleman) armed with some sort of handgun. No one testified at trial that Coleman did *not* have a gun that night. And Coleman himself admitted in his interview to at least handling a gun on the car ride to Lakemont.

Second, a rational factfinder could have found that, at some point during the fight between Dilworth and Lacour, Lacour yelled for someone in his group to shoot Dilworth.

Third, a rational factfinder could have found that, after Lacour yelled for someone to shoot, Coleman and the other gunman opened fire, with Coleman firing his gun at least three times, and the other gunman firing his gun at least four times. Recall that three fired 9mm Luger casings and fragments from two fired revolver projectiles were recovered from the crime scene, and fragments from two more fired revolver projectiles were recovered from Kemp's body during his autopsy. This ballistics evidence is consistent with the testimony of Dilworth, Molo, and Lewis, each of whom saw Coleman, the other gunman, or both open fire, and each of whom heard multiple additional shots while running from the scene of the shooting. The ballistics evidence is also consistent with the testimony of Spence, who heard multiple gunshots while ducking for cover.

14

Fourth and finally, a rational factfinder could have found that Kemp was shot five times, at least three times by the gunman with the revolver and, crucially, at least once by Coleman. The autopsy revealed that Kemp suffered five gunshot wounds, three perforating and two penetrating. The perforating gunshot wounds of entrance were to his right thigh, left buttock, and left backside. The penetrating gunshot wounds were to the right side of his neck and right side of his back. Both penetrating wounds were caused by projectiles fired from a revolver. And fragments from another revolver projectile were recovered from underneath Kemp's body. Assuming these fragments show that the gunman with the revolver shot Kemp in the back, thereby causing the perforating gunshot wound to Kemp's back, that leaves two more gunshot wounds—the perforating wound to Kemp's right thigh and the perforating wound to Kemp's left buttock. No projectile was directly linked to either wound. But the evidence shows that Coleman fired his gun at least three times. And although Dilworth and Molo testified that Coleman fired his first shot either toward the ground or in the air, no one testified at whom or what Coleman fired his second and third shots. Thus, a rational factfinder could have found that one or both of Coleman's additional shots hit Kemp.

In addition to the evidence already discussed, such a finding is supported by the location of the fired 9mm casings in relation to Kemp's body. The three casings were found in three different spots, suggesting that Coleman was not firing warning

15

shots into the air from a single location but rather shooting at someone while moving amidst the chaos of the fight.

Such a finding is further supported by the unfired 9mm Luger cartridge recovered from the crime scene. The unfired cartridge, considered together with the fired casings, suggests that, as Coleman fired his gun, the gun jammed, Coleman ejected the live round to clear the jam, and then continued firing—which is not what one would expect from someone merely firing warning shots into the air.

Finally, such a finding is supported by Coleman's recorded interview. In the interview, Coleman made a number of misstatements and claimed that Kemp had been shot by Spence—a claim supported by no other witness or item of physical evidence. Based on Coleman's misstatements and uncorroborated claim that Spence was the shooter, a rational factfinder could have inferred that Coleman was being deliberately untruthful in an attempt to avoid prosecution.

Despite this evidence and the reasonable inferences drawn from it, Coleman contends that there is legally insufficient evidence to convict him of murder. According to Coleman, the evidence is legally insufficient because (1) no witness testified that he shot at Kemp, and (2) the forensic evidence does not link him to Kemp's fatal gunshot wounds. In support of the latter point, Coleman emphasizes that neither his fingerprints nor DNA were recovered from any of the physical evidence and that none of the bullets from his gun were recovered from Kemp's

body. Coleman contends that the evidence, at most, shows that he fired three warning shots into the air while the second gunman fired at Kemp. We disagree.

First, although no witness testified that he observed Coleman shooting at Kemp, no witness affirmatively denied that Coleman shot Kemp either. This is unsurprising, given that the witnesses either began running or ducked for cover once the first gunshots were fired. Second, and as discussed above, the forensic evidence *does* link Coleman to Kemp's fatal gunshot wounds. Kemp was shot five times, Coleman shot his gun at least three times, and two of Kemp's perforating gunshot wounds were never matched with a projectile.

We hold that a rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *See Adames*, 353 S.W.3d at 860; *see also* TEX. PENAL CODE § 6.04(a) (codifying principal of concurrent causation). Accordingly, we overrule Coleman's first issue.

**Ultimate Question Testimony**

In his second issue, Coleman contends that the trial court abused its discretion in overruling his objection to and permitting the State's witness, Detective D. McKinnon, to offer testimony concerning the "ultimate question" of Coleman's guilt during the guilt-innocence phase of trial.

During the State's examination of Detective McKinnon, the following exchange took place:

Q.      Now, I'd like to show you what's marked here as State's Exhibit 113. Can you tell us what that is?

A.      That's a printout from one of the social media sites—I believe it's Facebook. And that is Corey Swagga Coleman. And that's a picture of the defendant there.

Q.      And, again, do you start looking through the social media posts after getting Crime Stoppers information that the Swagga team folks—

A.      —Yes, I did.

Q.      —and Corey Coleman were involved in George Kemp's murder?

A.      Yes.

At this point, Coleman's trial counsel made the following objection:

Your Honor, I want to object to him phrasing this as he was involved in a murder. That hasn't been established yet. That's the jury's province to determine whether this was a murder or not. So, I object to him using the term murder.

The trial court overruled the objection. On appeal, Coleman argues that the trial court's ruling was an abuse of discretion because it permitted Detective McKinnon "to testify to a matter regarding the ultimate question, thereby invading the province of the jury." We disagree.

Coleman's objection does not correspond to the question and answer to which he objected. Coleman objected to Detective McKinnon giving his opinion as to Coleman's guilt. But Detective McKinnon was not asked and did not otherwise provide testimony concerning whether he believed Coleman was guilty of murder.

18

Instead, the prosecutor asked whether Detective McKinnon had started looking through Coleman's social media posts after receiving Crime Stoppers tips that Coleman had been involved in the murder. The prosecutor did not ask whether Detective McKinnon believed Coleman was actually guilty of murder.

We hold that the trial court did not abuse its discretion in overruling Coleman's objection. Accordingly, we overrule his second issue.

**Gang Affiliation Testimony**

In his third issue, Coleman contends that the trial court abused its discretion in overruling his objection to and permitting Detective McKinnon to offer during the guilt-innocence phase of trial testimony concerning Coleman's gang affiliation. Before the State began its examination of Detective McKinnon, Coleman made the following objection:

> And just another point, Judge, I want to bring out. Officer McKinnon will make—will bring on testimony having to do with gang membership. Part of this investigation that was connecting Corey Coleman was that he was supposed to be involved with some Swagga gang. I don't mind Swagga group. But the term gang denotes such a negative connotation, Judge. I think under—the relevance under—and under 403, the prejudicial effect far outweighs any probative value that it would have. And so we would object to him referring to his investigation of Mr. Coleman being in a gang.

The trial court overruled Coleman's objection and granted Coleman a running objection. Coleman argues that the trial court's ruling was an abuse of discretion

19

because testimony describing Coleman's group as a "gang" was inadmissible under Rule 403. *See* TEX. R. EVID. 403.

Assuming without deciding that such testimony would have been inadmissible under Rule 403, Detective McKinnon never actually described Coleman's group as a gang, and the State did not otherwise attempt to prove up Coleman's gang membership during the guilt-innocence stage of trial. Because such evidence was never admitted, the trial court's ruling cannot be said to have harmed Coleman. Accordingly, we overrule Coleman's third issue.

### Inherent Prejudice

In his fourth issue, Coleman contends that the trial court abused its discretion in overruling his objection to inherently prejudicial courthouse decorations set up by the Fort Bend County Crime Victim's Response Team.

### A. Applicable law and standard of review

Under Texas law, a criminal defendant enjoys the right to be tried by impartial, indifferent jurors who base their verdict on evidence developed at trial. *Howard v. State*, 941 S.W.2d 102, 117 (Tex. Crim. App. 1996), *overruled on other grounds by Easley v. State*, 424 S.W.3d 535 (Tex. Crim. App. 2014); *Alfaro v. State*, 224 S.W.3d 426, 430 (Tex. App.—Houston [1st Dist.] 2006, no pet.). When a defendant claims reversible error based on some external influence on the jurors, he

must show either actual or inherent prejudice. *Howard*, 941 S.W.2d at 117; *Alfaro*, 224 S.W.3d at 430.

To determine inherent prejudice, we look to whether an unacceptable risk is presented of impermissible factors coming into play. *Howard*, 941 S.W.2d at 117; *Alfaro*, 224 S.W.3d at 431. The test is whether there is a reasonable probability that the external conduct or expression interfered with the jury's verdict. *Howard*, 941 S.W.2d at 117; *Alfaro*, 224 S.W.3d at 431. A finding of inherent prejudice rarely occurs and is reserved for only the most extreme situations. *See Howard*, 941 S.W.2d at 117; *Alfaro*, 224 S.W.3d at 431.

We review a trial court's ruling on a defendant's objection to inherently prejudicial external juror influence for an abuse of discretion. *See Alfaro*, 224 S.W.3d at 430 (reviewing denial of motion for mistrial based on inherent prejudice for abuse of discretion).

**B.    Analysis**

During the trial on the merits, in a hearing outside the presence of the jury, Coleman's trial counsel objected to a display in the common area of the courthouse by the Crime Victims' Response Team. The display consisted of a banner hung over the balcony rail; red, white, and blue balloons; and a table from which members of the Response Team passed out lunches and refreshments to passersby.

Coleman's trial counsel objected that the decorations "impose[d] a negative tone on the defense." He argued that the banner, balloons, and table could prejudice the jurors by suggesting that the county justice system favored crime victims and, by extension, the prosecution.

The trial court overruled the objection, noting that the display made no reference to the present case or parties involved and was done with "discretion and taste." The trial court further noted that the display was not in the courtroom itself or the anteroom immediately outside, but rather down the hallway away from the courtroom.

Coleman contends that the trial court's ruling was an abuse of discretion. On appeal, Coleman admits that he has failed to show actual prejudice. He argues that the display was inherently prejudicial because it "created the impression that the county government favors crime victims and by proxy the prosecution." We disagree.

The display was set up in the courthouse for less than one day. It was not in the courtroom where the trial was held. Nor was it near that courtroom. The display did not reference the trial or any of the parties involved. Nor did it disparage criminal defendants in general. On these facts, we conclude that the presence of the display did not constitute one of those "rare" and "extreme situations" in which inherent prejudice occurs. *See, e.g.*, *Howard*, 941 S.W.2d at 117–18 (holding that presence

22

of 20 uniformed officers at final jury argument for penalty phase of capital murder prosecution involving trooper victim did not violate defendant's right to fair trial when officers sat near back of courtroom and were mingled with 80 other spectators); *Parker v. State*, 462 S.W.3d 559, 567–69 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (holding no inherent prejudice when 60 to 70 spectators wore color purple, to support domestic violence awareness, during defendant's murder trial).

We overrule Coleman's fourth issue.

## *Batson* Challenge

In his fifth issue, Coleman contends that the trial court erred in denying his two *Batson* challenges[2] made when the State used two preemptory strikes against black panelists.

### A.   Applicable law and standard of review

The racially motivated use of a peremptory strike violates the Equal Protection Clause of the United States Constitution. *See Batson v. Kentucky*, 476 U.S. 79, 89 (1986); *see also* U.S. CONST. amend. XIV, § 1. The exclusion of even one juror with racial motive invalidates the jury selection process and requires a new trial. *Jones v. State*, 431 S.W.3d 149, 154 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd).

---

[2]      *Batson v. Kentucky*, 476 U.S. 79 (1986).

Named after the seminal Supreme Court decision, an objection that a peremptory strike was based on race is called a *Batson* challenge. The resolution of a *Batson* challenge involves a three-step process, which encourages prompt rulings on objections to peremptory challenges and reduces disruptions in the jury-selection process. *Nieto v. State*, 365 S.W.3d 673, 675–76 (Tex. Crim. App. 2012). First, the defendant must make a prima facie showing of racial discrimination. *Id.* at 676. If the defendant makes the requisite showing, the burden shifts to the prosecutor in the second step, requiring him to articulate a race-neutral explanation for the strike. *Id.* Finally, the trial court must determine if the defendant has proved purposeful discrimination. *Id.*

To determine whether the defendant has proved purposeful discrimination, the trial court should consider all relevant factors, including, by way of example:

- whether there is a statistical disparity between the percentage of minority and white panelists who were struck;

- whether the record supports or contradicts the prosecutor's explanation for its strikes;

- whether the reason given for the peremptory challenge is related to the facts of the case;

- whether the prosecutor questioned the minority panelists before striking them;

- whether there was disparate examination of minority panelists, i.e., whether the prosecutor examined minority panelists so as to evoke a certain response without asking the same question of white panelists; and

24

- whether there was disparate treatment of minority panelists, i.e., whether the prosecutor's explanations for striking minority panelists apply equally well to white panelists who were not struck.

*See id.* at 678 n.3.

The trial court's ruling in the third step must be sustained unless it is clearly erroneous. *Id.* at 676. The clearly erroneous standard is highly deferential because the trial court is in the best position to determine if the prosecutor's explanation is genuinely race neutral. *Id.* The trial court must focus on the genuineness of the asserted non-racial motive, rather than the reasonableness. *Id.* We defer to the trial court's ruling in the absence of exceptional circumstances. *Id.*

An appellate court should consider the entire record of the voir dire and need not limit itself to the specific arguments brought forth to the trial court by the parties. *Id.* A reviewing court may not substitute its judgment for the trial court's in deciding that the prosecutor's explanation was a pretext. *Id.* Just like the trial court, the reviewing court must focus on the genuineness, rather than the reasonableness, of the asserted non-racial motive. *Id.*

## B.    Analysis

At the close of voir dire, Coleman made four *Batson* challenges, arguing that the State had impermissibly exercised peremptory strikes against the only four black panelists in the strike zone—Panelist 1, Panelist 26, Panelist 29, and Panelist 45—on the basis of their race.

In response, the prosecutor stated that he struck Panelist 1 because that panelist was a teacher, and teachers, in the prosecutor's experience, were normally empathetic rather than rule-followers. The prosecutor further stated that Panelist 1 was young (22 years old) and had expressed reluctance about the one-witness rule. The prosecutor stated that he struck Panelist 26 because that panelist was an older man with a ponytail, a hairstyle that made the prosecutor uncomfortable. The prosecutor stated that he struck Panelist 29 because that panelist had been convicted twice of DWI, including once while on probation, and had ultimately served jail time for the offenses. And the prosecutor stated that he struck Panelist 45 because that panelist said he worked 12-hour nightshifts and would therefore be very tired during trial. The prosecutor further stated that Panelist 45 had a prior bad experience with law enforcement and that, while the panelist said he could set the experience aside in serving as a juror, it still concerned the prosecutor.

Defense counsel did not rebut any of the prosecutor's explanations, and he did not provide any argument or point to any evidence that the explanations were pretexts for purposeful discrimination.

After considering the arguments of both sides, the trial court sustained Coleman's challenges as to Panelists 1 and 26, but overruled Coleman's challenges as to Panelists 29 and 45. Coleman now contends that the trial court's rulings as to Panelists 29 and 45 were clearly erroneous.

### 1. Step 1: The prima facie inquiry is moot

At trial, Coleman attempted to make a prima facie case for racial discrimination by showing that the State used four peremptory strikes to remove all black panelists within selection range. Instead of disputing Coleman's argument for a prima facie case, the State offered an explanation for its strikes to the trial court. In doing so, the State rendered this step of the analysis moot. *See Simpson v. State*, 119 S.W.3d 262, 268 (Tex. Crim. App. 2003).

### 2. Step 2: The State provided race-neutral reasons for the strikes

Turning to the second step, we consider whether the State provided race-neutral explanations for the strikes of Panelists 29 and 45. *See Nieto*, 365 S.W.3d at 676. A race-neutral explanation is one based on something other than the race of the panelist. *Jones*, 431 S.W.3d at 155. At this step of the inquiry, the issue is simply the facial validity of the prosecutor's explanation. *Id.* Unless discriminatory intent is inherent in the explanation, the offered reason is race neutral. *Id.*

Here, the prosecutor explained that he struck Panelist 29 because that panelist had been convicted twice of DWI and had served time for the offenses. And the prosecutor explained that he struck Panelist 45 because that panelist worked 12-hour nightshifts and had a prior bad experience with law enforcement. Because race plays no overt role in either of these explanations, we hold that they are facially race-neutral.

### 3.     Step 3: Coleman failed to prove purposeful discrimination

Finally, we turn to the third step, in which we consider whether Coleman met his burden to prove purposeful discrimination. *See Nieto*, 365 S.W.3d at 676. The issue before us, then, is whether the trial court clearly erred in failing to find purposeful discrimination in the State's use of peremptory strikes.

Coleman argues that the trial court's ruling was clearly erroneous because there was disparate treatment of both Panelist 29 and Panelist 45. Disparate treatment occurs when persons of a different race who share the same or similar characteristics as the challenged juror were not struck. *Jones*, 431 S.W.3d at 156. To show disparate treatment, an appellant may analyze evidence in the record to compare panelists struck by the State with panelists whom the State did not strike. *Id.*

Here, Coleman claims that a comparative analysis would show that black panelists were treated disparately. But Coleman has not actually performed a comparative analysis. And the record is insufficient for us to conduct one ourselves. The juror information sheets do not reflect the race of each panelist.[3] And the

---

[3]     We note, however, that the record does reveal the races of the eleven panelists on which the State used its peremptory strikes. The State struck four black panelists; four white panelists; one Hispanic panelist; one Asian panelist; and one South Asian panelist. We further note that Fort Bend County is one of the most racially and ethnically diverse counties in the United States, with no single ethnic group forming a majority of the population.

panelists' criminal histories are not part of the record either. Without the information, we cannot conduct a comparative analysis to determine whether there was disparate treatment of black panelists.

Moreover, the prosecutor's explanations for his strikes of Panelists 29 and 45 are supported by both the record and case law. Although the panelists' criminal histories are not part of the record, the fact that Panelist 29 had been convicted of DWI twice is supported by the prosecutor's explanation of his strike and Coleman's trial counsel's failure to rebut that explanation. The case law supports the use of a peremptory strike based on prior convictions, as a prosecutor may reasonably conclude that such an experience would prejudice a panelist against the prosecution. *See Keeton v. State*, 749 S.W.2d 861, 870 (Tex. Crim. App. 1988) (prior misdemeanor convictions of venireman were legitimate, race neutral reasons for striking venireman in capital murder case).

The prosecutor said that he struck Panelist 45 because he worked night shifts, and the record shows that, during voir dire, Panelist 45 stated that he worked 12-hour shifts and would be tired during the trial: "I work 12-hours shifts, 6:00 to 6:00, so I'd—I would be getting up and going to my job and, like, in the morning—it ain't going to work. I'm barely struggling right now." From these comments, the prosecutor could have reasonably concluded that Panelist 45 did not want to serve as the juror and would not be an attentive or engaged juror. The prosecutor also said

that he struck Panelist 45 because he said he had a prior bad experience with a police officer. Specifically, Panelist 45 responded affirmatively when the prosecutor asked, "Is there anybody here who's ever had a bad experience with a police officer to the degree that you feel like: You know, 'Hey, that—that would be in my mind. I don't feel like I would be able to treat a police officer the same as another witness'?" Although Panelist 45 said he could still be a fair juror, his initial response could have reasonably led the prosecutor to have concerns.

We hold that Coleman failed to carry his burden of proving purposeful discrimination. *See, e.g.*, *Blackman v. State*, 414 S.W.3d 757, 770 (Tex. Crim. App. 2013) (affirming trial court's finding that State's reason for striking black panelist was race neutral based on panelist's demeanor and prosecutor's honest, but mistaken belief that panelist had served on jury which did not reach verdict or assess punishment); *Holmes v. State*, No. 01-03-00281-CR, 2004 WL 1119954 at *2 (Tex. App.—Houston [1st Dist.] May 20, 2004, pet. ref'd) (mem. op., not designated for publication) (affirming trial court's finding that State's strikes of two black panelists were not racially motivated when they had prior criminal records, one had difficulty answering questions, and defense did not rebut State's race neutral explanations).

Accordingly, we overrule Coleman's fifth issue.

## Conclusion

We affirm the trial court's judgment.

Laura Carter Higley
Justice

Panel consists of Chief Justice Radack and Justices Higley and Hightower.

Do not publish. TEX. R. APP. P. 47.2(b).