**Affirmed and Memorandum Opinion filed July 18, 2024.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-22-00722-CR

---

### JAMES  MCQUEEN, Appellant

### V.

### THE STATE OF TEXAS, Appellee

---

**On Appeal from the 263rd District Court**
**Harris County, Texas**
**Trial Court Cause No. 1540445**

---

### MEMORANDUM OPINION

Appellant was convicted of murder and sentenced to twenty years' imprisonment for shooting the complainant, who had been arguing earlier with appellant's son, at close range in the head. In three issues, appellant argues that the trial court erred (1) in admitting an unauthenticated videotape of the shooting and still photographs taken from it; (2) in overruling his *Batson v. Kentucky* challenge to the State's use of a peremptory strike on the only Black male in the venire; and (3) in admitting hearsay from the murder investigator. We affirm.

# I. BACKGROUND

In an episode recorded and streamed live by cell phone to the social media application Facebook ("Facebook Live video"), an argument between a group of young people ended in a shooting that killed Kendrick Robertson ("Kendrick").

On Super Bowl Sunday, February 5, 2017, a group of young people were playing basketball and socializing at an apartment complex in the Greenspoint area of Houston. Among the basketball players were Kendrick and two of his brothers. The evening became acrimonious when appellant's daughters started fighting nearby with a woman who was six or seven months pregnant. When a female neighbor tried to stop the fight, appellant's daughters fought with her too. Several of the young men on the basketball court "didn't like the fact that the girls jumped" a pregnant woman, and they got upset when appellant's son, James, Jr., "got in the middle of a female fight" and yanked the pregnant woman.

These basketball players, including Kendrick, then joined the by-then verbal argument. At this point, a mutual friend of those involved, Delon Milton ("Milton"), began the Facebook Live video, streaming it on his Facebook account. During the ensuing approximately six-and-a-half-minutes shown on the Facebook Live video, James, Jr., first tried to usher his sisters into their mother's apartment. The sisters instead continued to argue heatedly.

Feeling outnumbered, James, Jr., called appellant and asked him to "bring the tool so I can get my scratch," which a witness testified is slang for "bring the gun so I can have a fair fight." What James, Jr., either did not know or failed to relay to appellant was that the argument involved Kendrick and his brothers, who were children of a long-time family friend. As James, Jr., spoke on the phone and asked for the gun, Milton can be heard on the Facebook Live video trying to dissuade him, "Man, you can scratch now. You can scratch now, man, you don't

2

need no . . . ." But James, Jr., cut Milton off.

While James, Jr., called appellant, Kendrick's brother began trying to "defuse the situation." Further, Kendrick can be seen and heard on the Facebook Live video exclaiming that he had been "breaking it up but y'all [expletive] hit me." Kendrick's girlfriend also stepped between the arguing parties to separate them. As the argument between the young men deescalated, the argument between the women continued. One female voice can be heard on the Facebook Live video saying that that she "was going to stab the [expletive] out of [racial epithet]."[1]

James, Jr., then walked to one of the parking lots to await appellant. He can be heard on the Facebook Live video announcing, "Here go Pops," when appellant drove into the parking lot. James, Jr., then immediately reignited the argument into a physical fight, calling out, "Hey, what's up, hey! Come here. You want the scratch? You want the scratch? Where you going? Come here, you want the scratch?" James, Jr., ran back into the apartment complex's common area and started hitting a man who had earlier been part of the verbal argument. Gun in hand, appellant ran after James, Jr., with his daughters chasing behind him calling, "Daddy, chill! Daddy, chill!"

Standing nearby, Kendrick began turning toward the fight. In seconds, appellant ran from the parking lot with his gun raised and fired a shot into the back of Kendrick's head at close range. Appellant then fled, urged on by one daughter, as the participants and many witnesses scattered. Kendrick's girlfriend ran screaming to help him. Milton, still recording the Facebook Live video, also ran to Kendrick while calling out for someone to call 9-1-1.

---

[1] This female voice was not identified at trial, but James, Jr., testified that his mother was present with a knife, and the female neighbor testified that the mother had a knife and "told me if I ran up she was going to kill me."

3

Kendrick died the following day in the hospital. Afterwards, Kendrick's mother spoke to appellant's family on the telephone and heard appellant, whom she described as "like a brother," say in the background that he "[d]idn't know it was Kendrick" that he shot.

## II. AUTHENTICATION

In his first issue, appellant argues that the trial court erred in admitting State's Exhibits 17 through 58, which are the Facebook Live video, still photographs from it, and a frame-by-frame compilation of still photographs specific to the shooting, because the State did not authenticate them. *See* Tex. R. Evid. 901.

### A. PRESERVATION OF ERROR

When the State offered exhibits 17 through 58 in evidence, appellant stated that he was only objecting to State's Exhibits 17 and 58 and had no objection to the remainder of the exhibits. To preserve error for appellate review, the record must show that the appellant made a timely and specific request, objection, or motion and that the trial court ruled or refused to rule. *See* Tex. R. App. P. 33.1(a); *Martinez v. State*, 98 S.W.3d 189, 193 (Tex. Crim. App. 2003). When a defendant affirmatively asserts during trial that he has no objection to the admission of the complained of evidence, he waives any error in the admission of the evidence. *Moraguez v. State*, 701 S.W.2d 902, 904 (Tex. Crim. App. 1986). Additionally, an objection to some evidence does not preserve error as to other evidence. *See Martinez*, 98 S.W.3d at 193. Thus, appellant's argument as to State's Exhibits 18 through 57 has been waived.

### B. STANDARD OF REVIEW & APPLICABLE LAW

As to authentication of State's Exhibits 17 and 58, we review the trial

4

court's ruling under an abuse of discretion standard. *Fowler v. State*, 544 S.W.3d 844, 848 (Tex. Crim. App. 2018). This is a deferential standard, *id.*, and the trial court's ruling will be upheld when its decision is "within the zone of reasonable disagreement." *Tienda v. State*, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012) (quoting *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g)). To properly authenticate evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it to be. *See* Tex. R. Evid. 901(a). Given the wide diversity of electronic evidence, there is no single approach to authentication that will work in all instances. *Tienda*, 358 S.W.3d at 638. "Rather, as with the authentication of any kind of proffered evidence, the best or most appropriate method for authenticating electronic evidence will often depend upon the nature of the evidence and the circumstances of the particular case." *Id*.

## C. ANALYSIS

The State argues that it adequately authenticated the Facebook Live video in a proffer to the court:

> So this is a Facebook Live video. There was a witness on the scene who was recording this video on Facebook Live, the murder.
>
> We have the officer. The officer met with that witness, spoke with him, recorded that video from that witness's phone.
>
> . . . .
>
> The officer recorded a video from a witness at the scene. The witness who he got it from is the person whose face is on that video, he just straight up recorded it. The officer is going to be able to corroborate that he was at the scene, he saw the blood spot where the complainant was. So we believe that these distinct characteristics allow this video to be authenticated.

In addition to the proffer, the State cites the testimony of Robert Moss ("Moss"), a

homicide investigator formerly employed by the Houston Police Department, and witnesses from the crime scene. Moss was one of two homicide investigators dispatched to the crime scene roughly two hours after the shooting. Moss took the lead in interviewing six witnesses whom the patrol officers had located when they first responded to 9-1-1 calls about the shooting. The third witness Moss interviewed was Milton, who had streamed the Facebook Live video preceding and during the shooting. Moss viewed Milton's Facebook Live video while he was "on the scene that evening." With his employer-issued cell phone, Moss took a video of Milton's cell phone as it re-played the Facebook Live video.

Thus, State's Exhibit 17 is a recording of a recording. In it, the cracked screen of Milton's cell phone can be seen. Milton's video begins with the camera in "selfie" mode and shows his face as he explains that "we got a fight" and that he was "going to go live in a sec[ond], y'all." The video is six minutes and forty-three seconds long. The features of Facebook Live, such as the notation at the start of the video that "comments and reactions will appear based on when people left them during the video" and comments from Milton's Facebook friends, appear on Milton's screen as his video plays. Milton switches the camera from selfie mode to front-facing multiple times throughout the video, sometimes narrating and sometimes speaking to others present at the scene. At the three-minute, twenty-six-second mark, Milton briefly drops his phone. And aside from a lag at the three-minute, forty-nine-second mark, just after he comments that people are "blowing up his phone," Milton's video plays without interruption. Similarly, Moss's recording of Milton's recording plays continuously, without lags or pauses.

At trial, Moss explained that Milton was a witness at the scene who had known appellant for over a decade. Moss identified Milton from the Facebook Live video and from a still photograph. Moss further testified that Milton's video was

6

not just a regular video recorded with Milton's cell phone. Instead, Milton recorded it using the social media platform's Facebook Live feature. During cross-examination, Moss agreed that it was possible to edit video and to post changed images on Facebook but testified that it was "infinitely" harder to do so with Facebook Live because the video occurs live on the application. Moreover, Moss testified that Milton's Facebook Live video was consistent with the accounts of the witnesses he interviewed at the scene.

The State subpoenaed four witnesses who had been present the day of the shooting to testify at trial, including Kendrick's girlfriend, the female neighbor who fought with appellant's daughters, a male neighbor, and the girlfriend of one of Kendrick's brothers. All four witnesses testified that the Facebook Live video fairly and accurately or clearly showed the events they had witnessed that day. Kendrick's girlfriend further identified Milton at trial as a "mutual friend" who "was live streaming while everything was happening." Additionally, James, Jr., and one of appellant's daughters testified and viewed portions of the Facebook Live video during their testimony. Both identified themselves in the Facebook Live video. Both described the events of the day consistently with the Facebook Live video.

Milton did not testify at trial, having avoided service of the State's subpoena when the prosecution's investigator tried to serve the subpoena at multiple locations. The investigator left copies of the subpoena with Milton's family members. Some of the family members told the investigator that Milton was aware of the subpoena but was not going to cooperate. Thus, Milton was unavailable to testify at trial about his Facebook Live video or the events of the day.

Finally, in appellant's case-in-chief, a digital forensics analyst named Eric Devlin ("Devlin") testified. He explained that Facebook Live gives one the ability

7

to livestream data, which goes on a recording through the cell phone's camera to the cell phone and automatically into the application, where it is stored. He was critical of the failure of the police department to obtain a "forensic dump" of Milton's phone so that the video could be examined for editing by software and for its original exit and metadata. He testified that secondarily, the police also could have obtained the video from Facebook by court order. But because State's Exhibit 17 was a recording of a recording, Devlin testified that he could not determine whether the Facebook Live video had been edited "one way or another." He explained that he was able to play the video all the way through, but noted there were certain "stuttered" portions that could be either an element of editing or the user's switching the camera from forward-facing to rear-facing. Devlin also testified that it is possible to edit a Facebook Live video after it has already been transmitted to the Facebook platform, though it takes "more ability than your average user." He agreed that it is a "fairly normal method" for police to record a recording "just to know that you have it preserved." He also agreed that it can be difficult to obtain a forensic dump of a cell phone while at the crime scene because it can take between thirty minutes to twenty-eight hours to complete.

Testimony is not required from the person who recorded the video to authenticate it. *See Fowler*, 544 S.W.3d at 849–50. A video can instead be authenticated by a sponsoring witness who was present when the video was taken or had personal knowledge of the events depicted in it. *See Standmire v. State*, 475 S.W.3d 336, 344–45 (Tex. App.—Waco 2014, pet. ref'd); *cf. Harrison v. State*, No. CR-21-0423, 2023 WL 5314899, at *5, 10 (Ala. Crim App. Aug. 18, 2023) (addressing authentication of Facebook Live videos through testimony of witness to the crime, who later found the videos on defendant's social media); *People v. Y.L.*, 104 N.Y.S.3d 839, 842 (N.Y. Cnty. Ct. 2019) (addressing authentication by

defendants who identified themselves in Facebook Live video during police interrogation); *Lamb v. State*, 246 So.3d 400, 408–09 (Fla. Dist. Ct. App. 2018) (addressing authentication of Facebook Live video by digital forensic examiner who downloaded it from defendant's social media and testified that it had been posted within the timeframe of carjacking; defendant said "we live" on the video; and the carjacking victim identified his car and watch in the video, which defendant was driving and wearing respectively). A video can also be authenticated by "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." *Fowler*, 544 S.W.3d at 849 (quoting TEX. R. EVID. 901(b)(4)).

Given the live-streaming nature of the Facebook Live video, Moss's recording his video of it at the crime scene, the difficulty involved for an average person to have altered the Facebook Live video, and the testimony of witnesses who were present during events depicted in it, we agree that the State supplied adequate facts from which the trial court could determine that the Facebook Live video is authentic. *See id.* at 849–50. We conclude that the trial court did not abuse its discretion in overruling appellant's Rule 901 objection to State's Exhibit 17.

State's Exhibit 58 is a compilation on compact disk of 259 still shot photographs of the shooting, taken frame-by-frame from the Facebook Live video. The record does not reflect that State's Exhibit 58 was published to the jury or used with any witness after the trial court admitted it in evidence. The jury did not request to see it, or any other evidence, during its deliberations. Presumably, State's Exhibit 58 could have been played for the jury at a slower rate of speed than the real-time Facebook Live video to highlight the shooting.

Even if State's Exhibit 58 was not authenticated, its admission would be subject to a harmless error analysis under which we analyze (1) the character of the

9

alleged error and how it might be considered in connection with other evidence; (2) the nature of the evidence supporting the verdict; (3) the existence and degree of additional evidence indicating guilt; and (4) whether the State emphasized the complained of error. *Gonzalez v. State*, 544 S.W.3d 363, 373 (Tex. Crim. App. 2018). Given the lack of use of State's Exhibit 58 after it was admitted, coupled with the jury's viewing of the Facebook Live video multiple times during trial and the parties' use of still shot photographs from the video, any failure to authenticate State's Exhibit 58 would be harmless error. *See Brooks v. State*, 990 S.W.2d 278, 287 (Tex. Crim. App. 1999) (determining that error is harmless where challenged evidence is cumulative of other properly-admitted evidence); *Infante v. State*, 404 S.W.3d 656, 663–64 (Tex. App.—Houston [1st Dist.] 2012, no pet.). We thus conclude that any error in the trial court's admission of State's Exhibit 58 over appellant's Rule 901 objection was harmless.

Having concluded that the trial court did not err in admitting State's Exhibit 17, that appellant did not preserve his argument about State's Exhibits 18 through 57, and that any error in admitting State's Exhibit 58 was harmless, we overrule appellant's first issue.

### III.   *Batson* **Challenge**

In his second issue, appellant argues that the trial court erred in overruling his *Batson* challenge when the State struck the only Black male in the venire.

### A.   **Standard of Review & Applicable Law**

In *Batson v. Kentucky*, the Supreme Court held that the Fourteenth Amendment's Equal Protection Clause forbids the State from exercising peremptory strikes based solely on the race of a potential juror. 476 U.S. 79, 89 (1986); *see also Nieto v. State*, 365 S.W.3d 673, 675 (Tex. Crim. App. 2012). An

10

impermissible strike for a racially motivated reason invalidates the jury selection process and necessitates a new trial. *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008); *Jones v. State*, 431 S.W.3d 149, 154 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd). In a *Batson* challenge, the defendant must first make a *prima facie* showing of racial discrimination. *Nieto*, 365 S.W.3d at 676. The burden then shifts to the State to articulate a race-neutral explanation for the strike. *Id*. Finally, the trial court determines whether the defendant has proven purposeful discrimination. *Id*. The trial court must focus on the genuineness of the asserted non-racial motive, rather than the reasonableness. *Purkett v. Elem*, 514 U.S. 765, 769 (1995). Unless a discriminatory intent is inherent in the State's explanation, the reason offered will be deemed race neutral. *Id*. In evaluating the genuineness of the prosecutor's explanation, the trial court must determine if the defendant has proven purposeful discrimination by a preponderance of the evidence. *Blackman v. State*, 414 S.W.3d 757, 764–65 (Tex. Crim. App. 2013).

The trial court's ruling in the third step must be sustained unless it is clearly erroneous. *Snyder*, 552 U.S. at 477. We consider the entire voir dire record and need not limit ourselves to the specific arguments brought forth to the trial court by the parties. *Watkins v. State*, 245 S.W.3d 444, 448 (Tex. Crim. App. 2008). The clearly erroneous standard is highly deferential because the trial court is in the best position to determine if the prosecutor's explanation is genuinely race neutral. *Gibson v. State*, 144 S.W.3d 530, 534 (Tex. Crim. App. 2004). We defer to the trial court's ruling in the absence of exceptional circumstances. *Hernandez v. New York*, 500 U.S. 352, 366 (1991) (plurality op.). We will not disturb the trial court's ruling unless we are left with a definite and firm conviction that a mistake has been committed. *Id*. at 369.

**B.** **APPLICATION**

Step one of the *Batson* analysis, a prima facie showing of racial discrimination, was rendered moot when the State offered a race-neutral reason for its strike. *See Watkins v. State*, 245 S.W.3d 444, 447 (Tex. Crim. App. 2008) (stating that if the trial court immediately proceeds to step two after a defendant raises a question of purposeful discrimination, "a reviewing court is to assume that the opponent has satisfied his step-one obligation to make a prima facie case of purposeful discrimination and address only the second and third steps"). Under step two, a race-neutral explanation is one based on "something other than the race of the juror." *Hernandez*, 500 U.S. at 360; *see Jones*, 431 S.W.3d at 155. Here, the State explained that it struck venire member number twenty-five because of his response to questions about use of deadly force when responding to a verbal threat: "[B]ecause he said that words alone—he said that was, he believed that was enough. When [the co-prosecutor] was speaking with him he said verbal provocation would be enough to him. [The co-prosecutor] explained the law to him and he believed that was the issue." Because race plays no overt role in the State's explanation for striking venire member twenty-five, it is race-neutral. *See Hernandez*, 500 U.S. at 360; *Jones*, 431 S.W.3d at 155.

In the third step, we examine whether the trial court clearly erred in failing to find purposeful discrimination in the State's use of its peremptory strikes. *See Jones*, 431 S.W.3d at 155. The trial court must evaluate the facially race-neutral reasons given by the State to determine whether those explanations are genuine or merely a pretext for purposeful discrimination. *Whitsey v. State*, 796 S.W.2d 707, 713 (Tex. Crim. App. 1989). Appellant argues the State's explanation about striking venire member twenty-five was factually incorrect and thus pretextual. Appellant argues that the venire member's responses in voir dire were not as

definitive as the State represented to the trial court. Rather, the venire member responded that use of deadly force depended on the circumstances of the verbal threat: "I think it could be enough, but it shouldn't always be enough to defend yourself with deadly force." The venire member also agreed that "words could be enough in the right circumstance."

It was appellant's burden to show that the State's explanation for its strike was merely a pretext. *Johnson v. State*, 68 S.W.3d 644, 649 (Tex. Crim. App. 2002). It is not enough for appellant merely to show that the State's proffered explanation turns out to be incorrect. *See id*. Appellant has shown that the venire member's responses were not as strongly stated as represented in the State's proffered explanation, but this is not equal to proving the explanation was a pretext for a racially motivated strike. *Ford v. State*, 1 S.W.3d 691, 694 (Tex. Crim. App. 1999). We conclude that the trial court did not clearly err in step three of its *Batson* analysis, and we overrule appellant's second issue.

## IV. HEARSAY OBJECTION

In his third issue, appellant contends the trial court erred in overruling his hearsay objection to the portion of Officer Moss's testimony in which he stated that the Facebook Live video was consistent with his interviews of witnesses at the crime scene. Specifically, the State asked Moss, "And I don't want to talk about what other people were telling you, but was their version of the events consistent with what you saw in that video?" Moss responded, "Yes, it was consistent with the people that I interviewed that evening."

We review the trial court's evidentiary rulings for an abuse of discretion. *Casey v. State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007); *Gutierrez v. State*, 585 S.W.3d 599, 615 (Tex. App.—Houston [14th Dist.] 2019, no pet.). A trial court abuses its discretion if the ruling lies outside the zone of reasonable

disagreement. *Casey*, 215 S.W.3d at 879. Hearsay is an out-of-court statement offered into evidence to prove the truth of the matter asserted in the statement. Tex. R. Evid. 801(d). Generally, hearsay is not admissible unless the Texas Rules of Evidence, a statute, or other rule prescribed under statutory authority provides otherwise. Tex. R. Evid. 802.

Appellant compares Moss's testimony with the hearsay addressed in *Sanders v. State*, No. 06-10-00128-CR, 2011 WL 742646, at *2–3 (Tex. App.—Texarkana Mar. 3, 2011, no pet.) (mem. op., not designated for publication). In *Sanders*, a police officer began testifying about the substance of a co-defendant's interview, that the two defendants used the proceeds from their convenience store robbery to drive a van and buy drugs at a "narcotics location." *Id.* at *2–3. The officer in *Sanders* then testified that this was consistent with certain statements from the defendant. *Id.* at *2. Although couched in terms of his investigatory findings, the officer's testimony in *Sanders* offered out-of-court statements for proof of the matter asserted, which the court held was inadmissible hearsay. *Id*. at *3.

The State argues Moss's testimony—that the Facebook Live video was consistent with his interviews of witnesses at the crime scene—was offered for authentication of the video, not for the truth of the matter asserted. "[A] statement which is not offered to prove the truth of the matter asserted, but is offered for some other reason, is not hearsay." *Guidry v. State*, 9 S.W.3d 133, 152 (Tex. Crim. App. 1999). In support of its argument, the State cites *Rand v. State*, in which the prosecution argued on appeal that certain Facebook information, photographs, and text messages from a defendant's cell phone were offered for authentication, not the truth of the matter asserted. *Rand v. State*, No. 14-16-004090CR, 2017 WL 4273177, at * 7 (Tex. App.—Houston [14th Dist.] Sept. 26, 2017, pet. ref'd) (mem. op., not designated for publication). In *Rand*, however, this court was

unpersuaded by the State's argument. *See id*. at * 7. Instead, in *Rand* we examined whether the admission of this evidence was harmless error. *Id*. at * 7.

Similarly, even if Moss's testimony was hearsay, improper admission of hearsay evidence amounts to non-constitutional error. *See Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). Non-constitutional error that does not affect substantial rights must be disregarded. *See* Tex. R. App. P. 44.2(b). We may not reverse a conviction for non-constitutional error if, after examining the record as a whole, we have a fair assurance that the error did not have a substantial and injurious effect or influence in determining the jury's verdict. *Garcia v. State*, 126 S.W.3d 921, 927 (Tex. Crim. App. 2004). In determining harm, we consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, and the character of the alleged error and how it might be considered in connection with other evidence in the case. *Haley v. State*, 173 S.W.3d 510, 518 (Tex. Crim. App. 2005).

After review of the entire record, we conclude that Moss's brief testimony about consistency between the Facebook Live video and his witness interviews at the crime scene did not have a substantial and injurious effect on the jury's verdict. In determining whether admission of hearsay is harmless, appellate courts should consider the importance of the hearsay to the State's case; whether the hearsay was cumulative of other evidence; the presence or absence of evidence corroborating or contradicting the hearsay testimony on material points; and the overall strength of the prosecution's case. *Davis v. State*, 203 S.W.3d 845, 852 (Tex. Crim. App. 2006).

Here, the most contested aspect of the trial was whether appellant acted intentionally or in defense of others. In its closing argument, the State told the jury,

"The only element at issue is whether or not there was intent." The State emphasized that appellant was upset after James, Jr. called him for the gun and that he "knew what he was about to do" when he armed himself with a loaded gun, drove to the apartment complex, and immediately ran to the fight with the gun in hand. The State pointed out that his daughters knew the gravity of their father's temper as they called out, "Daddy, chill! Daddy, chill!" The State argued that appellant intended to kill Kenrick, summarizing a medical examiner's testimony that he believed there was soot on Kendrick's skull, which indicated a "very close range shot." In contrast, appellant testified at trial that he did not go to the apartment with the intent to kill anyone. Appellant instead testified that he was trying to protect his family. He admitted that he fired the shot that hit Kendrick, although he stated that he meant only to fire a warning shot into the ground. Appellant testified he was trying to "[j]ust protect the fight" his son had re-started and to prevent others from joining it, but Kendrick ducked past him.

Moss's testimony about the consistency of the Facebook Live video with witness interviews was also cumulative of other evidence. *See Davis*, 203 S.W.3d at 852. Various witnesses for the State who were at the crime scene testified at trial that the video accurately or clearly showed the events they had experienced. *See Garcia v. State*, 126 S.W.3d 921, 927 (Tex. Crim. App. 2004) (concluding there was considerable evidence from which jury could have determined appellant was abusive other that his wife's oral statements to a shelter employee). As to the presence or absence of evidence corroborating or contradicting the purported hearsay on material points, only appellant testified that a portion of the Facebook Live video—the part in which he shot the gun—varied from the actual events of the day. Appellant's son and daughter identified themselves in the video and referred to it throughout their testimony. His son and daughter's testimony were

also consistent with the Facebook Live video.

Thus, in our review of the record, we have fair assurance that Moss's purported hearsay testimony did not have a substantial and injurious effect or influence on the jury's verdict. *See Schutz v. State*, 63 S.W.3d 442, 444 (Tex. Crim. App. 2001). We overrule appellant's third issue.

## V. CONCLUSION

Having overruled appellant's three issues, we affirm the judgment of the trial court.

/s/    Margaret "Meg" Poissant
Justice

Panel consists of Justices Hassan, Poissant, and Wilson.

Do Not Publish — TEX. R. APP. P. 47.2(b).